[No. 1355.   Decided October 15, 1894.]

ROBERT P. RIGNEY, *Respondent*, v. THE TACOMA LIGHT & WATER COMPANY, and THE CITY OF TACOMA, *Appellants*.

WATER COURSE — WHAT CONSTITUTES — WRONGFUL DIVERSION — INJUNCTION — AMOUNT OF DAMAGE NECESSARY — ESTOPPEL — LACHES.

The fact that a stream widens into a marsh or swamp will not deprive it of its character as a natural water course, if it continues its current through the swamp, and finally emerges therefrom in a well defined channel.

The permanent diversion of the waters of a stream by a riparian owner for the purpose of supplying a neighboring town with water is unlawful, and may be enjoined by a lower riparian proprietor.

Although the actual damage to a riparian proprietor by reason of the diversion of water from a stream flowing over his land may be slight, from a pecuniary point of view, still he is entitled to relief in a court of equity. (HOYT, J., dissents.)

The fact that the complainant in a suit to restrain the diversion of a stream from its natural flow has a right to an action for the recovery of damages does not afford such an adequate and effectual relief at law as to bar recourse to a court of equity, when the diversion is a continuing one, constantly operating to his injury.

The fact that a lower riparian proprietor stands by for several years without seeking relief in the courts, after an upper riparian

proprietor has wrongfully diverted the waters of a stream, and allows the wrongdoer to construct expensive dams, flumes and conduits to convey diverted waters to a neighboring town, contains none of the essential elements of estoppel.

The doctrine of laches or acquiescence cannot be invoked to defeat the application of a lower riparian proprietor for an injunction against the wrongful diversion of the waters of a stream against which he had protested but had instituted no legal proceedings, although the diversion has continued for a period of nine years, and during that time expensive dams and flumes have been erected by the parties wrongfully diverting the stream, as the complainant was not called upon to object to the construction of the dams and flumes if they were erected upon other premises than his own.

(STILES, J., dissents.)

*Appeal from Superior Court, Pierce County.*

*Charles W. Seymour*, and *F. H. Murray*, for appellants.
*Baker & Campbell*, for respondent.

The opinion of the court was delivered by

ANDERS, J. — The respondent instituted this action to obtain an injunction against The Tacoma Light & Water Company, a duly organized corporation, to restrain it from diverting the waters, or any part thereof, of Spanaway (or Bushalier) creek, and of Upper Clover creek, from their natural channels, or polluting the same, and to compel it to remove the dams, flumes, ditches and filters placed therein, or connected therewith, by said defendant, and to restore said waters to their natural bed or channel.

That a large portion of the waters of the streams above mentioned have been and still are diverted therefrom and carried by means of flumes and ditches to the city of Tacoma, and there consumed, is not disputed. The acts causing the diversion were all done by the water company, but, after the commencement of this action, it sold its plant to the city, and for that reason the city was made a party defendant by order of the court.

The proof clearly shows that the plaintiff, respondent

here, is the owner in fee of about three hundred and forty acres of land which is used, and for a long time has been used, for agricultural purposes and for pasturing stock, and that the plaintiff resides thereon.

The stream designated as Upper Clover creek originates in some springs several miles eastward from Smith's swamp, into which it flows. Spanaway creek, also called Bushalier creek, is the outlet of Spanaway lake, and, a short distance from its source, it divides into two branches, one of which flows through "Tule lake" and into Smith's swamp or lake, on the east side thereof, and the other, known as Morey creek, also flows into the same swamp at its southeastern extremity. The waters which thus unite in this swamp flow out of it at its westerly end and form what is called Clover creek, which flows through the lands of the respondent. The evidence discloses that Smith's swamp covers an area of one hundred acres, or more, nearly all of which, in its natural state, was covered with water during the rainy season, but at other times of the year became comparatively dry, except around the margin, where the water always remained.

It must be conceded—in fact it is not disputed—that the respondent is a riparian proprietor and entitled to all the rights of such proprietor, if Clover creek is a natural water course. But whether it is such, and, if so, whether the waters diverted by the Light & Water Company were any part of the waters thereof, were questions which were strongly controverted at the trial. It was contended on the part of the defendants that the streams from which said defendant abstracted the water for the use of the inhabitants of the city of Tacoma were not sources, or tributaries, of Clover creek, but that they ceased to be streams at all when they discharged their waters into Smith's swamp for the alleged reason that they then and there entirely lost their identity and formed a distinct body of

water, having none of the essential characteristics of a water course. The court, however, found, in effect, contrary to the contention of the defendants, that Clover creek was a natural water course, whose source was not Smith's swamp, but the streams which were diverted by the defendants.

The questions determined were questions of fact, and upon the evidence in the record, we are not prepared to say that the court arrived at an erroneous conclusion. There was considerable positive testimony tending to show not only that there were, during a large portion of each year, currents flowing through Smith's swamp from the points where it receives the waters of the streams in question to the outlet in Clover creek, but that such currents were confined to regular, well defined channels.

There can, we think, be little doubt that lower Clover creek is an ancient water course, notwithstanding the fact that its channel has been deepened artificially within the last ten or fifteen years for the purpose of draining the swamp from whence it flows. From the time of the earliest settlement of the country it has flowed in a definite and easily distinguished channel, and was seldom, perhaps never, dry prior to the commission of the acts complained of.

Having a bed, banks and current it is a natural water course, even although it may, at times, be dry. Gould, Waters, § 41. Both Spanaway creek and Upper Clover creek are virtually conceded to be natural streams of water, and the mere fact that their united volume spreads out into a broad sheet with currents, covering a large area of low ground to which the appellation of swamp or lake has been given, does not deprive them of their character as water courses.

Upon the question of whether a given body of water is

a lake, or pond, or a river, Gould, in his work on Waters, § 79, says:

"The fact that there is a current from a higher to a lower level does not make that a river which would otherwise be a lake, nor does a lake lose its distinctive character because there is a current in it for a certain distance tending towards a river which forms its outlet. On the other hand, the fact that a river broadens into a pond-like sheet with a current does not deprive it of its character as a river. Where it is admitted or not denied that the water is not a lake or pond, the material difference between which is in size, the only criterion by which to determine whether it is a river, is the existence of a current, and this question cannot be answered by ascertaining what appellations have been given to it."

In a late and well considered case in Wisconsin, the supreme court of that state held that the fact that a stream spread over wide reaches of marshes and swamps, on or below the surface, did not militate against its being a water course in every essential particular, so long as it could be identified as the same stream. And the identity of the stream, through the marshes and swamps, was in that case disclosed solely by its current, there being no defined channel or channels whatever. *Case v. Hoffman*, 84 Wis. 438 (54 N. W. 793).

Viewed in the light of these authorities, and others which might be cited, we are of the opinion that the facts in this case fully justified the trial court in concluding that the waters diverted by said defendant were the waters of lower Clover creek.

And, it being conceded that the water company has been diverting the water for several years last past, in large quantities, and not returning any portion so taken to the channels in which it was accustomed to flow, it has, during all of said time, been engaged in the commission of unlawful acts whether it was or is a riparian proprietor at the particular points where such diversions have been made or

not.   Not even a riparian owner has a right to divert a
stream permanently from its natural course, and thus de-
prive others of their rights therein.   Such an act, in itself,
is wholly unlawful.   *Crook v. Hewitt.* 4 Wash. 749 (31 Pac.
28).   And the purpose for which the water diverted may
be used makes no difference as to the force and effect of
this rule.   Accordingly it is said by Kerr that a diversion
of water from a stream for the purpose of supplying a
neighboring town with water is not a lawful user of the
water. Kerr, Injunctions (2d ed.), p. 229.

But, in this case, the defendants, in their answers, under-
take to justify their acts on the alleged grounds: *First,*
That on May 21, 1884, one James Rigney, plaintiff's an-
cestor and grantor, for a good and valuable consideration,
and by an instrument in writing which was duly recorded
in the office of the auditor of Pierce county, granted to the
defendant water company the right to take and use the
waters, for the taking and using of which this action was
brought, and released and discharged said defendant from
any and all claims for damages on the part of said
James Rigney, his heirs or assigns, including plaintiff, on
account of taking said waters, or any part thereof; and,
*second,* that the plaintiff was, at all times, fully informed
of the operations of the Light & Water Company, and
of the city, as its successor and grantee of all its interests,
and, without protest or objection, allowed the said water
company to make its connections, build its structures, and
take the water for the use of the city, and is thereby es-
topped from maintaining this action.

As to the first ground of justification above mentioned,
but little need be said.   It was not specially pressed at the
hearing in this court.   The written instrument referred
to, although purporting upon its face to be the contract or
covenant of James Rigney and Ann Rigney, his wife, was
not executed by the latter, and, upon her refusing to do so,

the former at once informed the company of the fact, and notified its superintendent that the contemplated agreement was at an end.   Beside, it does not appear that the water company ever complied with the conditions set forth in the instrument, and which were necessary to give it force and effect.   Nor does it appear from the evidence that the company really, at any time, relied upon this writing as authorizing it to divert the water from the premises now owned by the respondent.   In fact, judging by the acts and declarations of the company's agents, when objections were made to its using the water, we think no such claim as we are now considering was ever made, or seriously entertained, prior to the commencement of this action.   The fact that the instrument was placed upon the public records of the county by the company is a matter of little or no consequence, under the facts and circumstances disclosed by the evidence.

Before entering upon a discussion of the question whether or not the respondent has by his own laches or acquiescence forfeited any right he might otherwise have had to the relief demanded, we will briefly consider two other points raised by the learned counsel for the appellants, viz.: (1) That the wrongs complained of are theoretical, and the causes of damage, if any exist, are, at best, uncertain; and (2) that the complainant has an ample and adequate remedy at law for the redress of the injuries alleged, if such really exist.

Are the wrongs complained of, in fact, theoretical? They certainly are not if any of the substantial rights of respondent have been wrongfully invaded by the appellants.   The legal rights of riparian proprietors upon natural water courses are well settled and generally understood.   Every such proprietor is entitled, in the absence of grant, license, or prescription, limiting his right, to have the stream which passes over or adjacent to his lands flow

as it is wont by nature, affected only in quantity or quality by the consequences of a reasonable use thereof by other proprietors.    See *Crook v. Hewitt, supra,* and *Lux v. Haggin,* 69 Cal. 255 (10 Pac. 674).

The right of the riparian proprietor to the flow of the water is inseparably annexed to the soil, and passes with it, not as a mere easement or appurtenance, but as part and parcel of it.    Use does not create, and disuse cannot destroy or suspend, it.    *Johnson v. Jordan,* 2 Metc. (Mass.) 239; *Lux v. Haggin, supra.*    The riparian proprietor has no property in the water itself, but a simple usufruct while it passes along.    1 Wood, Nuisances (3d. ed.), p. 471.    The right to the use of water flowing over land is identified with the realty, and is a real and corporeal hereditament.    *Cary v. Daniels,* 5 Metc. (Mass.) 238. And this right is a substantial one, and may be the subject of sale or lease like the land itself.    1 Wood, Nuisances (2d ed.), p. 412.    The respondent, having this clear legal right to the natural flow of the waters of Clover creek over his lands, cannot be unwillingly deprived of it without compensation or due process of law, even by the public, or for a public use, without disregarding the fundamental law of this state.    Even if his damages were shown to be slight, or merely nominal ( which is not shown ), the right still exists, and cannot be violated with impunity. Actual damage is not indispensable as the foundation of an action.    It is sufficient to show a violation of a right. The law will then presume some damage.

And when the act done is such that, by its repetition or continuance it may become the foundation or evidence of an adverse right, its repetition or continuance will be restrained by injunction.    *Webb v. Portland Mfg. Co.,* 3 Sumn. 189.    In all such cases a court of equity is the only tribunal competent to grant speedy and adequate relief. And it will not withhold its aid simply because the injuries

sought to be redressed may not be the cause of great pecuniary damage.    While a court of equity will not undertake to correct merely theoretical or imaginary wrongs, it will never refuse its aid, in cases where it has jurisdiction, to enforce clear legal rights, however small they may appear when viewed from a merely pecuniary standpoint.    Concerning this question Mr. Wood well says:

"But if the legal remedy does not afford that relief to which the party in equity and good conscience is entitled, the smallness of the damages on the one hand, or the magnitude of the interest to be affected on the other, will not prevent the exercise of the preventive power of the court. Indeed, it was remarked in one case by an eminent jurist whose opinions are entitled to great weight: 'Even slight infringements of rights, by a large company of persons, ought to be watched with a careful eye, and repressed with a strict hand by a court of equity, where it can exercise jurisdiction.' "   2 Wood, Nuisances, p. 1151.

Is the appellants' further contention that the respondent is not entitled to an injunction because he has an ample and adequate remedy at law well founded?   We think it is not.    While it is perhaps true that the respondent may recover in an action at law such damages as he may be entitled to on account of past injuries, he can hardly be said to have a present legal remedy for the injuries which may and probably will be inflicted upon his property in the future by a continuance of the wrongs complained of. The mere fact that he may bring a separate action for each recurring injury does not prove the adequacy of the legal remedy.    Indeed, there is no adequate and effectual relief from a constantly operating injury save that of prevention. And no court can exercise direct preventive power but a court of equity.    It follows, therefore, that the respondent is entitled to have the appellants restrained from further diverting the waters of the creek from his land, and compelled to restore them to their natural channels unless he

has so far waived his rights that it would now be inequitable to enforce them by means of an injunction.

It must be borne in mind that the statute of limitations is neither pleaded nor relied on as a defense to this action. It is asserted, in the brief of counsel, that the plaintiff has virtually slept upon the rights he now claims for a period of ten years, and allowed the defendants to expend a large sum of money in structures and improvements, knowing that they were relying upon his silence and upon the grant obtained from his ancestor and grantor, James Rigney. We have already expressed our views as to the force and effect of the alleged "grant" from James Rigney, and will, therefore, say nothing further upon that subject. And, as to the rights of the plaintiff which he now claims, it seems that they did not arise until after most, if not all, of the defendant's structures and improvements had been erected and made, for he did not become the owner of the lands described in the complaint until the years 1890 and 1891, if we have correctly ascertained the dates of his respective deeds. Since he acquired his title it can hardly be said that he has done or said, or failed to do or say, anything which can give rise to an estoppel. But, conceding, without deciding, that if the defendants had acquired a right of diversion as against plaintiff's grantors, their right was not destroyed by the conveyance to the plaintiff, the question then is, were the plaintiff's grantors entitled to equitable relief as against the defendants at the time of the transfer? Now the case as made by the proofs seems to be wanting in the essential elements of an estoppel proper. An estoppel is well defined by Judge Peckham, in *New York Rubber Co. v. Rothery*, 107 N. Y. 310 (14 N. E. 269), cited by respondent, as follows:

"To constitute it [an estoppel] the person sought to be estopped must do some act or make some admission with an intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, and

which act or admission is inconsistent with the claim he proposes now to make. The other party, too, must have acted upon the strength of such admission or conduct.''

It is not shown that either the plaintiff or his grantor did any act or made any admission with the intention of influencing the conduct of the defendants, or that the latter did the acts complained of by reason of any acts or admissions on the part of the former. The principle of estoppel is, therefore, inapplicable here. But it is claimed that at all events the kindred and analogous principle of acquiescence or laches is applicable and constitutes a complete bar to the action. It is true that this action was not commenced against the defendant corporation until nearly nine years after it began to divert the water from the premises now owned by the plaintiff. It is also true that courts of equity, in the exercise of a sound discretion, have often refused relief to suitors soliciting their intervention who have failed to assert their rights in court as promptly as they should have done; but it by no means follows that in no case will relief be granted in equity where there has been considerable delay in applying for it.

It is often remarked by courts and text writers that courts of equity will refuse relief to stale demands, but, ''even in cases where laches are allowed to operate as a defense, the question is to be determined in the discretion of the court upon all of the circumstances of the case.'' *Galway v. M. E. Ry. Co.*, 128 N. Y. 132 (28 N. E. 479). If it appears in any particular case that the laches of the complainant have not been such as to show his assent to the acts complained of and their consequences, he ought not to be turned out of court simply because he might have begun his action sooner. In *Lux v. Haggin, supra*, in speaking of acquiescence as a defense in an action for an injunction, the court said:

''It may fairly be deduced from the authorities we have consulted that the acquiescence which will bar a complain-

ant from the exercise in his favor of the discretionary juris-
diction by injunction must be such as proves his assent to
the acts of the defendant, and to the injuries to himself
which have flowed or can reasonably be anticipated to flow,
from those acts.    If a degree of acquiescence less than es-
tablishes such assent has been regarded in any decision, it
will be seen that it has been treated merely as tending to
prove some other fact which rendered it inequitable to
grant a preventive order.''

In that case the authorities cited by the appellants in
this case to sustain their position, and many more not here
cited, were fairly and ably reviewed, and from them the
court very properly, in our judgment, deduced the propo-
sitions of law above quoted.    The object of that action
was to enjoin a canal company from diverting the waters
of Kern river from the premises of the plaintiff, and one
of the defenses was that the plaintiff was estopped from
objecting to the diversion by reason of the fact that the
ditches used in diverting the water were constructed at
great expense, with his knowledge and without objection
or protest by him—a defense similar to that now under
consideration.    Touching this question, Mr. Pomeroy re-
marks:

''Acquiescence in the wrongful conduct of another by
which one's rights are invaded may often operate, upon
the principles of and in analogy to estoppel, to preclude
the injured party from obtaining many distinctively equita-
ble remedies to which he would otherwise be entitled.
This form of *quasi* estoppel does not cut off the party's
title, nor his remedy at law; it simply bars his right to
equitable relief, and leaves him to his legal actions alone.
In order that this effect may be produced, the acquiescence
must be with knowledge of the wrongful acts themselves,
and of their injurious consequences; it must be voluntary,
not the result of accident, nor of causes rendering it a
physical, legal, or moral necessity, and it must last for an
unreasonable length of time, so that it will be inequitable
even to the wrongdoer to enforce the peculiar remedies of

equity against him, after he has been suffered to go on un-
molested, and his conduct apparently acquiesced in.    It
follows that what will amount to a sufficient acquiescence
in any particular case must largely depend upon its own
special circumstances  .   .   .    This effect of delay is sub-
ject to the important limitation that it is properly confined
to claims for purely equitable remedies to which the
party has no strict legal right.    Where an injunction is
asked in support of a strict *legal* right, the party is entitled
to it if his legal right is established; mere delay and acqui-
escence will not, therefore, defeat the remedy, unless it
has continued so long as to defeat the right itself.'' 2
Pomeroy, Eq. Jur., § 817.

The important limitation of the effect of delay, men-
tioned by that learned author, is sometimes apparently
overlooked, or not properly applied, and laches and ac-
quiescence are often referred to, in general terms, as de-
fenses in all equitable actions, limited only by the court's
discretion.    None of the flumes, dams, or other structures
erected by the defendant company for the purpose of con-
veying water to the city of Tacoma were erected or placed
on the premises of the plaintiff, and, therefore, neither he
nor his grantors had a right to object to their being so con-
structed, even if they were fully apprised of the character
and extent of the same, which is not at all certain.    More-
over, the company acted with full knowledge of the rights
of plaintiff's grantors, as is shown by its having under-
taken to secure them for a pecuniary consideration.

As a matter of fact the record is destitute of proof that
the wrongful acts here complained of were ever acquiesced
in, or assented to, unless the mere abstaining from legal
proceedings must necessarily be regarded as such proof,
and we must decline to so regard it.    The evidence shows
that the water company was, from time to time, up to at
least the year 1889, remonstrated with against diverting
these streams, and that whenever objection was made, a
portion of the water would be turned into its natural chan-

nel. Nor is this all. The company's superintendent, when complaint was made to him assured plaintiff that the use of the water was not intended to be permanent but only temporary, and that the then source of supply would be soon abandoned, and the water for the use of the city obtained elsewhere. These facts alone would be sufficient to justify the delay in bringing this action, if such justification were necessary. There is nothing in the case showing that the injuries inflicted upon the property of the plaintiff were perpetrated with the owner's consent, nor anything from which his consent can be justly inferred.

In the late case of *Galway v. M. E. Ry. Co.*, *supra*, the question of acquiescence as an equitable defense was directly involved, and was discussed with great learning and acumen by Chief Justice RUGER. The action was brought to restrain the defendant from further maintaining and operating an elevated street railway on Sixth avenue, in the city of New York, adjacent to plaintiff's property. The plaintiff saw the railroad in the course of construction in front of his premises, and, from time to time, saw what the defendants were doing in respect thereto, and occasionally, as a passenger, rode upon it. He subscribed money to pay for counsel to prevent the erection of the road, but otherwise made no protest, and delayed instituting legal proceedings to enjoin its operation until more than ten years had elapsed from the time the road was constructed. And, under that state of facts, it was held that the plaintiff was entitled to an injunction. The trial court had refused to find at the request of the defendants, "that plaintiff's alleged right of action is barred by his acquiescence in said railroad and its operation, and his use thereof as a passenger, and that he is estopped from maintaining the action." And, upon that proposition, the court of appeals, citing numerous authorities, said:

"The doctrine of acquiescence as a defense to an equity action has been generally limited here to those of an equit-

able nature exclusively, or to cases where the legal right has expired, or the party has lost his right of property by prescription or adverse possession.    Whatever may be the rule in other states, it can be said that here, no period of inaction merely has been held sufficient to justify a nuisance or trespass, unless it has continued for such a length of time as will authorize the presumption of a grant.    The principal that so long as the legal right exists the owner is entitled to maintain his action in equity to restrain violations of this right, has been uniformly applied in this court.''

It was further said that that court had uniformly adhered to the doctrine that, where a legal right is involved, and upon grounds of equity jurisdiction, the courts have been called upon to sustain the legal right, the mere laches of a party, unaccompanied by circumstances amounting to an estoppel constitutes no defense to such action, and that such is the doctrine, generally, of the elementary writers.

The same rule was briefly, though clearly, announced by Chief Justice FULLER, in *Menendez v. Holt*, 128 U. S. 523, (9 Sup. Ct. 143), where, speaking for the court, he said:

''Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself.''

In this case the respondent's right to use and enjoy the water which would naturally flow over his lands, if not diverted by the defendants, is clear and positive, and has neither been waived by delay nor forfeited by acts or admissions amounting to an estoppel.    For years he has been, and still is, interfered with in the enjoyment of that right.    He now asks a court of equity to protect him from further injury and annoyance, and we think he is entitled to the injunction awarded by the trial court.    The judgment is, therefore, affirmed.    But, in order to afford the defendant city an opportunity to acquire the right from the plaintiff, by legal proceedings or otherwise, to divert

the water heretofore wrongfully diverted from plaintiff's premises, the decree of the court below will not be operative or take effect until ninety days from and after the date of the issuance of the remittitur herein.

DUNBAR, C. J., and SCOTT, J., concur.

HOYT, J. (*concurring*).—I cannot concur in that part of the foregoing opinion which holds that actual damage is not indispensable as the foundation for an action of this kind. In my opinion a court of equity will not interfere for the protection of the rights of a party under the circumstances shown by this record until it is made to appear not only that some of them are being violated, but also that such deprivation has resulted, or is likely to result, in substantial damage. In this case I think the proofs warrant the holding that there was substantial damage to the plaintiff by the acts of the defendant, and I, therefore, concur in the affirmance of the judgment.

STILES, J. (*dissenting*).—I have examined the authorities upon which the court bases the foregoing opinion and do not find any of them exactly in point in this particular case, where a public municipal corporation, having the power of eminent domain, is concerned. In support of my view that injunction should not lie I quote the syllabus in *City of Logansport v. Uhl*, 99 Ind. 531:

"Where the owner of a water power stands by, and, not objecting, permits a city, without first assessing and paying his damages, to erect works for a water supply by drawing water from the stream and thus diminishing his power, he creates an equitable estoppel, so that he will not be protected by injunction, but will be left to assert his rights at law."

This was a unanimous decision, where the time elapsed was only three years.