ANDERSON LAND & STOCK CO. v. McCONNELL et al.

(Circuit Court, D. Nevada. December 24, 1910.)

No. 783.

1. WATERS AND WATER COURSES (§ 152*)—APPROPRIATION.

Proof that haying was done on the respective meadows of parties claiming prior appropriation of water for irrigation, without evidence as to whether the hay was raised by artificial irrigation or by the use of a natural overflow, was insufficient to establish an appropriation.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 156, 157; Dec. Dig. § 152.*]

2. WATERS AND WATER COURSES (§ 35*)—RIPARIAN OWNERSHIP—COMMON-LAW DOCTRINE—ABROGATION.

In Nevada the doctrine of riparian ownership as a foundation for rights to water has been abandoned; all rights to the use of water by reason of necessity arising from the arid nature of the country being founded on prior appropriation only.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 27, 28; Dec. Dig. § 35.*]

3. WATERS AND WATER COURSES (§ 151*)—APPROPRIATION—ABANDONMENT.

Abandonment of an appropriation of water for irrigation is a question of intention to be evidenced by overt acts; but, when such overt acts appear, the right to appropriate water ceases and cannot be resumed as against intervening rights of others.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 155; Dec. Dig. § 151.*]

4. WATERS AND WATER COURSES (§ 142*)—APPROPRIATION.

Where complainant's predecessor in title, though conceding a prior appropriation by defendants, was entitled to the unused water naturally flowing to him from defendants' land, and was entitled to insist that such unused water be not diverted elsewhere, but should be allowed to return to the stream and serve his appropriation, such unused water was not waste water, but excess above the water defendants were entitled to appropriate, which they could not by subsequent enlargement of their ditches, etc., appropriate to complainant's prejudice.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 152; Dec. Dig. § 142.*]

5. WATERS AND WATER COURSES (§ 130*)—NATURAL WATER COURSES—CHANNEL.

Where, though a water course spread out over a meadow in delta formation and was broken up into several channels, it could be identified on

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the surface, and flowed in a defined course through low depressions, it was a natural water course, and subject to appropriation by the land-owner, though there was no definitely defined channel on the surface.

[Ed. Note.—For other cases, see Waters and Water Courses. Cent. Dig. § 145; Dec. Dig. § 130.*]

6. WATERS AND WATER COURSES (§ 152*)—APPROPRIATION—PRIORITY—EVIDENCE.

In an action to determine water rights for irrigation, evidence *held* to require a finding that complainant was entitled to priority as a prior appropriator as to certain streams.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 156, 157: Dec. Dig. § 152.*]

In Equity. Suit by the Anderson Land & Stock Company against Charles McConnell, revived after his death pendente lite in the name of Thomas A. McConnell, executor of the will of Charles McConnell, deceased, and Thomas McConnell individually. Decree for complainant.

See, also, 171 Fed. 475.

Mack & Green and J. W. Dorsey, for complainant.
Cheney, Massey & Price and Harry Warren, for defendants.

VAN FLEET, District Judge. This is a suit in equity to determine conflicting rights of the parties to the waters of three natural water courses known as "Quin River," "Eight Mile Creek," and "Twelve Mile Creek," sometimes called "Three Mile Creek." The complainant is the owner of about 4,000 acres of land formerly belonging to Henry Hoppin, and known and herein designated as the "Hoppin Ranch." Respondent, Charles McConnell, was the owner of about 6,000 acres adjoining the Hoppin ranch on the north and of two smaller neighboring ranches called herein the "Upper Eight Mile" and "Upper Twelve Mile" ranches, respectively. Pending the determination of the suit, respondent, Charles McConnell, died and Thomas McConnell, as executor, was substituted. Charles McConnell filed a cross-bill alleging rights by prior appropriation to the waters of the streams in controversy, and Thomas McConnell individually has filed a cross-bill setting up a right by appropriation of the waters of Quin river and Eight Mile creek, prior to the complainant and subsequent to that of the respondent Thomas McConnell as executor. Thomas McConnell's land consists of 160 acres at the southwesterly corner of the main McConnell ranch and adjoining the Hoppin ranch.

It appears from the evidence that Quin river rises in the mountains of northern Humboldt county in this state, and flows in a generally southwesterly direction and, so far as affects this controversy, passes first through the McConnell ranch and then through the Hoppin ranch immediately below and adjoining on the south. In passing through the McConnell ranch, it separates into several channels or sloughs. Hardin slough, which puts out from the river above the McConnell ranch is west of the main river channel, uniting with it again on the Hoppin ranch, and is not in controversy in this litigation. The first slough east of the river, apparently having no fixed local desig-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

nation, but named by the complainant and respondents respectively, "Beef Corral Slough" and "Main Slough," branches from the river in the northerly portion of the McConnell ranch, and flows in a southwesterly direction approximately parallel to the river channel onto the lands of the Hoppin ranch, and there rejoins the main river channel. "Eight Mile Slough," so called, a natural water course, not heading in the river but apparently on the McConnell meadows, and hereafter found to be a part of the channel of Eight Mile creek, is easterly of and approximately parallel in its course to that of Main or Beef Corral slough, and after passing through the McConnell meadows proceeds through the Hoppin ranch in the same general southwesterly direction until it unites with the main Quin river channel near the lower southwesterly corner of the Hoppin ranch. Eight Mile creek rises in a range of mountains on the easterly side of the Quin River Valley, and, after passing through the Upper Eight Mile ranch of Charles McConnell situated at the point where Eight Mile creek emerges from the mountain canyon, flows in a northwesterly course for about two miles over sagebrush lands not owned by the parties hereto until it enters the easterly line of the main McConnell ranch. Upon entering the McConnell meadows, its visible channel largely disappears and in its natural state uninfluenced by artificial diversions the waters flow across the McConnell meadows, flattening and spreading out fanlike but generally following a definite course through low depressions first northwesterly and then southwesterly for a distance of a half or three-quarters of a mile, until they reach and unite in the natural channel above referred to as Eight Mile slough. Twelve Mile creek, formerly known as Three Mile creek, rises in the same range of mountains as Eight Mile creek, and emerges from a canyon at a distance of about four miles southerly from the latter, passes through the small ranch above mentioned belonging to Charles McConnell, designated as Upper Twelve Mile ranch, which is situated at the point where the stream debouches from its canyon, and, after passing in a northwesterly direction through about two miles of sagebrush land not belonging to the parties, enters the Hoppin ranch at its southeasterly corner, and, proceeding in the same general northwesterly direction, spreads over and disperses itself in the Hoppin meadows, the waters then flowing southwesterly with no defined channel until they reach Eight Mile slough and Quin river. Canyon and Pole creeks, mentioned in the evidence, lie successively to the south of Twelve Mile creek, and, substantially paralleling its course, flow toward Quin river. They enter the Hoppin ranch on its southerly boundary, and their waters are used and can be used only on the southerly portion of the Hoppin ranch; no claim being made by the respondent to the waters of these creeks.

The Hoppin ranch was purchased by James P. Anderson, grantor of the complainant, in 1900. Prior thereto Charles McConnell and Henry Hoppin do not appear to have had any differences over the use of the waters in controversy. The water on the main McConnell ranch was diverted by ditches and dams upon the McConnell meadows and pasture, returning by natural flow to Main or Beef Corral slough and

Eight Mile slough, and after being used by McConnell naturally flowed to and was diverted by Hoppin by various ditches and dams situate partly on his own place and partly in the southerly portion of the McConnell ranch, upon the Hoppin meadows and pastures. There was no cultivation on either ranch by plowing; the water being used to raise wild hay and natural pasturage.

Shortly after the purchase of the Hoppin ranch by Anderson, McConnell began to construct new ditches and to enlarge and extend existing ditches so as to lead the waters of Quin river and Eight Mile creek upon certain lands in the southeasterly corner of his ranch and upon the Thomas McConnell lands above mentioned. These lands, formerly in sagebrush, were on higher ground easterly of the McConnell meadows and have been set out in alfalfa, about 160 acres in all The character of the soil of these latter lands and the natural configuration of the ground is such that none of the water so diverted naturally reaches the Hoppin meadows. In addition to this new diversion, Charles McConnell, in 1906, after the beginning of this litigation, built a ditch from the Upper Eight Mile ranch diverting the waters of Eight Mile creek from their channel and carrying them in a course approximately parallel to the channel, but to the south thereof, to the westerly portions of the McConnell ranch, where they were used upon the alfalfa fields just mentioned and entirely consumed. In 1902 alfalfa was also planted by McConnell at the Upper Twelve Mile ranch, and all the waters of Twelve Mile creek diverted thereon so that no water reached the Hoppin ranch from that source. The result has been that except in certain years of abundant water, as for example the years 1906 and 1907, the irrigated lands of complainant in the westerly, northerly, and easterly portions thereof have been deprived of water which they had previously enjoyed, leaving unaffected by lack of water supply only certain portions of the southerly part of complainant's ranch which were served by the waters of Pole and Canyon creeks.

The case was tried in open court, and the taking of evidence consumed 10 or 12 days. Approximately 30 witnesses were examined. During the trial testimony was offered concerning the history of these ranches for approximately 40 years. The complexity of the problems involved has been increased by the fact, as shown by the evidence, that by numerous natural waterways or sloughs other than those above named, and by a large number of ditches constructed by the parties, the waters of Quin river and of Eight Mile creek have been mingled; dams have been built, both temporary and permanent, and have been washed out; and ditches constructed and abandoned. It has not been possible for either the witnesses or the court in all instances to satisfactorily define the locations of the ditches or dams as to which testimony has been offered, and the testimony covering so broad a period is naturally very conflicting. Furthermore, it appears that at the time of the yearly recurring spring season of flood the waters of all these streams spread over the lands of the parties and for the time afford sufficient water for all. It appears also that in years of abundant water both parties have sufficient for their uses even after

the diversions herein complained of; the difficulty arising only in years of average or insufficient water.

[1] The evidence, as indicated, presents all the perplexities which may be expected from the nature of the subject. There is much testimony in the record which is vague and much that is inconclusive and in many instances sharply conflicting. For example, many witnesses have testified that haying was done on the respective meadows at various early dates without giving any definite information as to whether the hay was raised from irrigation by artificial means or by the use of natural overflow which would found no right of appropriation. Walsh v. Wallace, 26 Nev. 299, 67 Pac. 914, 99 Am. St. Rep. 692. The court must also inevitably disregard some testimony in cases of conflict without any imputation upon its sincerity. As stated by Judge Hawley in Union Mill & Mining Co. v. Dangberg (C. C.) 81 Fed. 99:

"One can naturally understand that lapse of memory comes with lapse of time, and that any man, however conscientious or honest, may be mistaken as to events that transpired 40 or more years ago; and the truth of such matter, as to the time of any. given transaction, can often only be solved by comparing the testimony of the witnesses with known and uncontradicted facts as to the date of other events which all concede occurred at or about the same time. One can also readily understand the uncertainty, and sometimes, if not always, the unreliability, of the testimony of witnesses who attempt to give with any degree of precision the amount of land under irrigation, or the exact amount of water flowing in a river, stream, cut, canal, or ditch, by merely looking at it."

The questions presented for solution are largely those of fact, and as to the general principles of law applicable to those facts, when ascertained, there is little, if any, controversy.

[2] In the state of Nevada the doctrine of riparian ownership as a foundation for rights to water has been definitely abandoned, and rights to the use of water founded, by reason of necessity arising from the arid nature of the country, upon prior appropriation only. The rules governing such right of appropriation, so far as necessary to state them, have been codified in Cutting's Compiled Laws of Nevada, as follows:

"Sec. 354. All natural water courses and natural lakes, and the waters thereof which are not held in private ownership, belong to the state, and are subject to regulation and control by the state."

"Sec. 356. There is no absolute property in the waters of a natural water course or natural lake. No right can be acquired to such waters except as usufructuary right—the right to use it, or to dispose of its use for a beneficial purpose. When the necessity for the use of the water does not exist, the right to divert it ceases, and no person shall be permitted to divert or use the waters of a natural water course or lake except at such times as the water is required for a beneficial purpose.

"Sec. 357. No person shall be permitted to divert or use any more of the waters of a natural water course or natural lake than sufficient, when properly and economically used, to answer the purpose for which the diversion is made; nor shall any person be permitted to waste any such water, and all surplus water remaining after use, unavoidable wastage excepted, shall be returned to the channel by the persons diverting the same without unreasonable delay or detention.

"Sec. 358. Any person who has acquired the right to use the water for a beneficial purpose may change the place of diversion and manner of use; provided, such change does not substantially injure the rights of others."

An able exposition of the law of prior appropriation as obtaining in this state, but not necessary to be here restated, will also be found in Hewitt v. Story, 64 Fed. 514, 12 C. C. A. 250, 30 L. R. A. 265, and Union Mill, etc., Co. v. Dangberg, supra, decided by the late Judge Hawley. Having these general principles in view, we will proceed to examine the history of the settlement and cultivation of these ranches and the appropriations of waters made by the respective parties, or their grantors; and it will be most convenient to consider this history in its relation to the several streams whose waters are in controversy:

As to Twelve Mile creek: Charles McConnell drove a band of sheep to Quin River Valley in the fall of 1869 and established a camp at what is now the Upper Twelve Mile ranch at the point where the stream emerges from its canyon in the mountains. During the year 1870 shearing corrals were built, and a small ditch was taken from the creek to keep the dust down while the men were shearing. A small garden for vegetables, apparently about one-half acre in extent, was planted in 1871. Charles McConnell married in 1872 and took his wife to the Twelve Mile camp. In 1876 he moved to the Upper Eight Mile ranch and took his buildings with him. The evidence of any continued use of water at the Twelve Mile ranch after such removal is quite vague and unsatisfactory. It tended to show that as late as the early nineties various Indians, at uncertain intervals, cultivated a small garden patch on the place and raised vegetables by means of water; but it wholly fails to show the nature of their right thereto. The respondents endeavored to establish that these Indians occupied the position of tenants toward McConnell; but I find the evidence entirely insufficient to establish any such relation.

Henry Hoppin came to the Quin River Valley and established himself on the present ranch of the complainant in 1870. He diverted the waters of Twelve Mile creek where it entered his boundaries by a ditch, now existing, at least as early as 1877; and such diversion continued unbrokenly down to its interruption in 1902, and without any interference or claim adverse thereto by Charles McConnell.

The testimony as to the beneficial use of water at the Upper Twelve Mile ranch by the respondents or their predecessors during the period approximating 26 years, from the time Charles McConnell moved away in 1876 to the time that Thomas McConnell, Jr., began to put in alfalfa in 1902, shows only such a vagrant, occasional, fugitive, and uncertain use as conclusively raises a presumption of abandonment. Charles McConnell's needs in that stream apparently ended when he moved his home to the Upper Eight Mile ranch, and no definite right to those waters was thereafter asserted by him.

[3] Abandonment is a question of intention, to be evidenced by overt acts; but, when such overt acts appear, the right to appropriate water, like any usufructuary right, ceases and cannot be resumed after the rights of others have intervened. Hewitt v. Story, 64 Fed. 515, 516, 12 C. C. A. 250, 30 L. R. A. 265, and cases therein cited. It is entirely clear from that evidence that the respondents have no rights

whatsoever in the waters of Twelve Mile creek except in subordination to complainant's appropriation, and that the complainant has the right to the entire flow thereof unobstructed by any acts of diversion by the respondents.

As to Quin river and Eight Mile creek: The first settlement on Eight Mile creek was made by one Rose in 1867 at the place now called the Upper Eight Mile ranch, where the stream emerges from the mountains on the east of the Quin River Valley. Rose made some small cultivation of the ground and used some water from the creek. He was apparently a squatter and is not connected in any chain of title with respondents' ownership of the land. He was there only one season and was succeeded by one Peter Flynn. The old Idaho stage road ran by the place, and Flynn kept a station for travelers by stage. He had a small vegetable garden and a small field of barley irrigated by ditches from Eight Mile creek. The amount of acreage under cultivation is variously estimated and widely divergent in the testimony. Flynn sold to Charles McConnell in 1872. McConnell, as heretofore stated, moved his home from Twelve Mile creek to Eight Mile creek about 1876, and remained there for 20 years, or until he removed to his present location on the main McConnell meadows near Quin river in 1896. After this last removal, further cultivation of the Upper Eight Mile ranch was abandoned, and the fields grew up in sagebrush; the place of use of the water hitherto diverted at the upper ranch being apparently transferred with the change of the home. This situation continued until about 1906, when, as stated above, the old ditch at the upper ranch was continued northwesterly parallel to the creek until it entered the main McConnell ranch south of the creek channel and was used to divert all the waters of Eight Mile creek upon the newly planted alfalfa fields.

It seems to be practically conceded by complainant that Flynn was the first appropriator on Eight Mile creek; but the amount diverted is in dispute. The testimony as to the quantity of land under cultivation at the Upper Eight Mile ranch or station is, as indicated, very unsatisfactory, and the estimates of the acreage cultivated show a wide variance. It was shown, however, that in this country an abandoned cultivated field grows up with sagebrush and other desert vegetation, and that such new growth is so distinguished by its size, color, and manner of growth from the ancient undisturbed growth outside the cultivated area as to present a natural line of demarcation between the two areas and affords thereby a definite basis for accurate determination of the acreage formerly cultivated. Complainant's engineer testified that, taking this sharply defined demarcation as a basis, he had surveyed the ground thus shown to have been under cultivation at the Upper Eight Mile ranch, and the result of the survey showed 6.77 acres of such land. This is the only evidence of a definite nature on the subject, and, in the absence of any satisfactory evidence to the contrary, I must accept this estimate as a reliable index of the fact; and the extent of the right to the water by the Flynn appropriation, which does not appear to have been extended through the McConnell occupancy, will be determined upon this basis.

The main McConnell meadow or ranch, as indicated above, is watered both by the waters of Eight Mile creek and of Quin river. The first settlement at this latter place seems to have been made by a man named Anderson, not connected with the complainant. For perhaps two or three years prior to 1871 this man Anderson had been cutting wild grass or hay in the vicinity of the delta of Eight Mile creek. There is some evidence that he had made a ditch from Quin river; but it is too vague to predicate a finding of appropriation and continued use in favor of respondents to any extent. McConnell bought him out in 1871. As has been stated, Hoppin settled at his ranch, now owned by complainant, in 1870.

According to the witness Cogswell, who worked for McConnell from 1872 to 1875, crops of natural grass or hay were gathered from both the Hoppin and McConnell ranches and were grown by the natural overflow from the streams and without resort at that time to artificial irrigation by either party. Before very long, however, it is evident that the parties began to build dams and ditches to divert the waters of Eight Mile and Quin river upon their ranches, and in the course of years an elaborate system of irrigation was built up upon each ranch. Some of these dams were purely temporary in character, consisting of brush and manure which was renewed each year. Many were not connected with ditches, but were placed in the natural sloughs and depressions to swell the waters onto adjoining land, whence they would flow back to the stream below the dam. The natural slope of the land on both ranches was such that the waters diverted above would return to Eight Mile slough or Beef Corral slough, where they would be again diverted, and so on in a cycle many times repeated. It naturally follows that all the waters of Eight Mile creek and a large part of the waters of Quin river were successively used each season first on the McConnell place as above indicated, and then in the natural course of their flow upon the Hoppin ranch in the same manner. As long as Hoppin and McConnell were neighbors, the system of irrigation thus pursued was satisfactory to each and to a considerable extent in conjunction. Each ranch as far as appears had sufficient water, and there is nothing to show that either ranch used an excessive amount of water. During this period the use of the waters was confined, on both ranches, to the irrigation of the meadow land, largely, and to a lesser extent to pasture lands. It is at once apparent that, in the case of a system of irrigation upon two adjoining ranches developed and maintained in the manner and by the means as above stated, during a period practically identical in time, the question of prior appropriation must necessarily be, as in this instance, difficult of ascertainment. It will be necessary for that purpose first to get as near as may be the exact facts as to the times of construction and location of the more important ditches. These ditches are designated by letters on respondents' map and by names on complainant's map.

"A" ditch begins at a dam diverting part of the waters of Quin river situated above the northerly boundary of the McConnell ranch, at a point designated as Upper Diversion. This Upper Diversion dam is apparently very old; built, as indicated, possibly as early as 1876.

In 1903 the "A" ditch was built from a natural slough running out at Upper Diversion dam, thence in a southeasterly direction through McConnell's pasture lands to a fence a little north of Eight Mile creek (marked "128 A" on complainant's map). Eight Mile ditch had been apparently built southerly from Eight Mile creek in 1895; how far does not appear, but at that time its water, which came from Eight Mile creek, crossed over into the "C" ditch hereafter described. The space between point 128 A and the head of the old Eight Mile ditch was connected by a ditch in 1904 and 1905 after the beginning of this litigation. It diverts a portion of the waters of Quin river upon the sagebrush and alfalfa land above referred to in the southeasterly portion of the McConnell ranch. The evidence shows that its waters do not thereafter reach the Hoppin land below.

"B" ditch is a short ditch beginning like "A" ditch in a natural slough served by the Upper Diversion dam and terminating in pasture land in the northerly part of the McConnell ranch. Prior to the building of the "A" ditch, such water as was diverted by the Upper Diversion dam passed through the "B" ditch. It was apparently there as early as 1880; but the witness Hayward says that in 1865 it was used only in periods of high water. The testimony as to its use at periods other than of high water is indefinite and unsatisfactory, and I conclude that it was only so used.

"C" or Alfalfa ditch and "E" or Company ditch both properly begin, as indicated on complainant's map, at a dam in Quin river called the "Lower Diversion Dam." The two ditches diverge just below the township line between township 46 north, range 38 east, and township 47 above. The Lower Diversion dam is properly placed as on complainant's map at a point in Quin river near the easterly and westerly half section line of section 32, township 47 north, range 38 east. Apparently a dam at lower diversion existed as early as 1876, and at that time a short 30-yard ditch led out of it to the east. A ditch was extended from this point to the point 22 F below the township line where the "C" ditch and "E" ditch now diverge, in the years 1881 and following. This portion was built by Charles McConnell and Henry Hoppin under a joint appropriation which will be hereafter referred to. There is evidence that "C" or Alfalfa ditch from the point 22 F on complainant's map was commenced in the fall of 1897 and used in the spring of 1898. It is impossible to tell from the testimony with absolute accuracy how far it went at that time; but it extended apparently but little below the McConnell buildings, and its waters flowed down into Eight Mile Slough. In 1901, 1902, and 1903 it was further extended to Charles McConnell's alfalfa lands and the lands of Thomas McConnell at the southeasterly corner of the McConnell ranch, in which use its waters are lost to the complainant's lands below. "D" or Middle ditch is a fork of the Alfalfa ditch serving the same alfalfa lands and completed between 1901 and 1903.

"E" or Company ditch, as above stated, began at the Lower Diversion dam in 1881 under the joint construction of McConnell and Hoppin. Between then and 1884 it was extended as far south as the point in the southeast quarter of section 6 on McConnell's ranch de-

scribed on complainant's map as "14 J." Through part of this course it runs through natural sloughs or channels previously existing. Its southerly limit at the time of the transfer of the Hoppin ranch to Anderson, the immediate predecessor of complainant, appears to have been about the easterly and westerly half section line of section 7 on the McConnell ranch. In its course this ditch at that time irrigated part of the land on the McConnell ranch between Beef Corral slough and Eight Mile slough, and, passing to the east of Eight Mile slough, spread its waters upon the McConnell meadows at that point. All this water flowed by natural gravitation toward Beef Corral slough and Eight Mile slough, respectively, and thus went down to the Hoppin ranch.

About the year 1903 the Company ditch was extended by defendants south so as to serve the alfalfa lands and the Thomas McConnell lands heretofore described. Its southerly terminus, like the southerly terminus of the "D" or Middle ditch, is at the division fence between the two ranches; but the water so diverted is entirely consumed on the McConnell land or, as in times of unusual flow, is delivered upon the Anderson ranch at a point where it cannot be beneficially used thereon.

The "F" or Tom ditch was built by Charles McConnell in 1879, and diverts the waters of Beef Corral slough into Eight Mile slough at a point about halfway up the McConnell meadows. "K" or Plowbeam ditch No. 1 is a ditch existing as early as 1883, and is extended to a short distance above the Anderson north fence. It carries the waters of Beef Corral slough into Eight Mile slough. It does not satisfactorily appear by whom this ditch was built; but its location clearly indicates that it was intended principally, if not entirely, for the benefit of the Hoppin ranch. Plowbeam ditch No. 2 was built in 1877 by Henry Hoppin and enlarged in 1878. It carries the waters of Beef Corral slough, diverted at the point 75 A by means of various natural sloughs and artificial ditches, into Eight Mile slough immediately north of Anderson's northerly fence. From that point in Eight Mile slough dams and a series of ditches radiating southeasterly carry the water of the two sloughs thus intermingled out upon the complainant's meadows.

All of the above ditches except the radiating ditches last mentioned are on the McConnell ranch. In addition, many other smaller ditches and many dams regulated the flow of the water at the time of the transfer of the Hoppin ranch to Anderson.

Upon the last-named ranch, at the time of the transfer, an elaborate system of dams and ditches diverted water from Eight Mile slough both easterly and westerly, from Beef Corral slough likewise in both directions, and in certain seasons from Quin river easterly.

From the above description deduced from the evidence it will be seen that the new Eight Mile ditch and "A" ditch have been constructed, and "C", "D", and "E" ditches have been extended by the McConnells since the transfer of the Hoppin ranch to Anderson, with the result that all of the water in Eight Mile creek and of Quin river has been diverted to the high alfalfa ground on the McConnell ranch and does not reach the Hoppin meadows in the ditches theretofore ex-

isting and hereinabove described. It will be seen that the system of ditches on the McConnell ranch as used prior to the transfer was of mutual benefit, and with the Hoppin ditches was adapted to the successive repeated use of the waters of the two streams, first upon the McConnell meadow land, and later upon the meadows of the Hoppin ranch. Under these circumstances, it is a matter of no surprise to find some further evidence of mutual action between the then owners of the two ranches. In 1880 Charles McConnell and Henry Hoppin filed a joint ditch claim affecting the waters of Quin river, together with a plat showing the course of three different ditches therein claimed. Ditch No. 1, as designated in that claim, started at Upper Diversion and to my mind must be identified with "B" ditch above described. Ditch No. 2 was west of the river and is of no interest in this controversy. Ditch No. 3, however, is clearly identical with the upper or joint portions of the Company or Alfalfa ditches, and it is clearly this ditch which was constructed by Henry Hoppin and Charles McConnell in 1881. Ditch No. 3 plainly benefited not only the lands north of the township line through which it ran, but flowed upon the McConnell meadows, in township 46 north, range 38 east, and after use there flowed down through Eight Mile slough upon the Hoppin meadows. About this time it also appears that there was an exchange of lands between Hoppin and McConnell; Hoppin conveying to McConnell certain tracts in the northerly portion of the present McConnell ranch, and McConnell conveying to Hoppin a considerable quantity of land in the present Anderson ranch, much of which is under the flow of Eight Mile creek and Beef Corral slough. It is claimed by the respondents that the transfer of these lands, in the absence of any clause of reservation, conveyed to McConnell all water rights arising out of the joint location notice. While this might be true as to the Ditches 1 and 2, I think any such intention or purpose clearly negatived as to the waters diverted by Ditch No. 3 which discharged upon the upper McConnell meadows and formed a part of the waters benefiting the lands conveyed to Hoppin in the exchange and thereafter continued to so flow. The parties did not act upon any such theory until after the purchase by Anderson. Not only was the Upper Company ditch constructed by the parties jointly, but it appears from the testimony of the witness Thad Hoppin the flow through the headgate was at all times subject to regulation for the benefit of the Hoppin ranch. The respondents deny Henry Hoppin's part in the construction of this ditch; but the preponderance of evidence and the situation of the parties seem to me conclusive of the fact. As to the waters of Quin river, I conclude that complainant and respondent Thomas McConnell, executor, are each entitled to the waters thereof flowing through the ditch at lower diversion, and that complainant is entitled to regulate the flow in such way as to protect its right to one-half of such waters. This equal right, however, neither prevents McConnell from first using all the water of the ditch on his lands, nor does it give him the right to divert his moiety away from the watershed. The complainant is, I think, clearly entitled to have the water jointly diverted by his predecessors come down to him in the channels that existed

prior to the extensions and diversions later made by McConnell to new lands as above indicated.

As to appropriation from Quin river other than the amount included in the joint diversion mentioned, it is sufficient to say that by a preponderance of the evidence the complainant has established a priority. The amount of water acquired thus and by the joint appropriation will be determined by the acreage to which it was devoted.

With respect to the question of priority of appropriation of the waters of Eight Mile creek other than the amount included in the Flynn appropriation, the matter is difficult of solution. The witness Foster testifies to a ditch across the Hoppin meadows northwesterly of the ranch buildings as being in existence as early as 1873 or 1874. Apparently this ditch was from Eight Mile slough. This evidence itself is not so certain and convincing as could be desired; but, taken in connection with the testimony of Thad Hoppin and others and with the situation of the parties and the natural configuration of the ground, it seems to me sufficiently clear that the first appropriation of Eight Mile waters was made by Henry Hoppin. The McConnell ranch is intersected by numerous small swalelike depressions or natural channels which facilitate the flow and spread of the water, especially during seasons of high water, and naturally moisten the adjacent meadows. In addition to this, Eight Mile creek when it reached the meadow in its natural course spread out fanlike through these depressions as heretofore described and gave its entire flow for the benefit of the meadow before collecting again into Eight Mile slough. The Hoppin ranch has broader meadows, generally flat in character, and largely without these natural advantages, making necessary to a greater extent a resort to artificial means by dams and ditches to spread the water over the fields; and, as water became scarce from more numerous settlements and increased cultivation in the upper part of the Quin River Valley, the Hoppin ranch would be the first to feel the scarcity and the necessary resort to artificial means for the distribution of its water. Such corroboration as these physical facts afford, together with the evidence given by the witnesses Foster and Thad Hoppin, are, I think, sufficient to establish a prior appropriation in favor of the complainant.

[4] Respondents seem to rest their case both as to Eight Mile and Quin river waters upon the contention that Hoppin's use was merely of waste water from the McConnell ranch, and rely upon Burkart v. Meiberg, 37 Colo. 187, 190, 86 Pac. 98, 99, 6 L. R. A. (N. S.) 1104, 1106, 119 Am. St. Rep. 279. But I do not think the doctrine of that case applies. In that case it appeared that defendants owned valid water rights in several ditches having their headgates in a natural stream, and with this water had for a number of years irrigated a tract of land. Some of this water by surface drainage from the irrigated land passed upon the field of plaintiff adjoining, where plaintiff, by means of an irrigating ditch running parallel with the common boundary line, collected the water and diverted it for her own uses. Defendants subsequently dug a parallel ditch upon their own land,

thus saving the water which had escaped to plaintiff's land and ditch, and carried it to other lands belonging to them and away from plaintiff. It appeared, however, in that case that plaintiff did not claim by virtue of an appropriation from the same stream. The court says:

"The plaintiff does not assert the right to the use of this water by virtue of an appropriation made from the same stream, or any of its tributaries, which are the source of defendants' supply. She cannot, therefore, like a prior or junior appropriator of water from the same stream, insist upon an economical use by the defendants of their appropriation."

The case, therefore, is not in point for two reasons: First, that here the Hoppins, as we have seen, were the first appropriators, except to the limited extent above noted; and, second, that even if their appropriation was subsequent to that of McConnell, they had the right to insist that the unused water naturally flowing to them from the McConnell ranch should not be diverted elsewhere, but should be allowed to return to the stream to serve their appropriation. There is, strictly speaking, under the evidence, no waste water question in this case. If McConnell as an appropriator prior in right had diverted more than his fields should need, the excess thus diverted was not the subject of any rights resting in him, but was part of the water to which even a junior appropriator would be entitled. It was part of the water appropriated by Hoppin, and could not be diverted elsewhere by McConnell. It is immaterial, so far as respondents are concerned, whether or not Hoppin collected a part of it in a ditch intercepting it on its way to Eight Mile slough.

[5] Respondents also contend with great earnestness that Eight Mile creek and Eight Mile slough do not constitute a continuous water course; that Eight Mile creek ends within the McConnell ranch, and its waters therefore are in no sense subject to appropriation by the complainant based upon a diversion made from Eight Mile slough. It has already been stated that after Eight Mile creek enters the main McConnell ranch and passes onto the McConnell meadow it spreads in delta like form losing its banks and definite channel. The gradient of Eight Mile creek, originally steep, changes as it leaves the higher lands and enters the main McConnell meadows where its débris-burdened flood waters naturally meet the overflow of the flood waters of Quin river. The result inevitably follows that with the cessation of rapid flow the débris is dropped and a delta is formed, leaving the water to escape to its ultimate destination as best it may, naturally following the lowest places. It appears clearly from the testimony that, despite the spreading of the water over the meadow, the major portion of it flows in a definite course through the low depressions above described, which are so interrelated that, while no definite channel traverses the meadow land, a number of broken or partial channels to Eight Mile slough may be identified upon the surface. Even respondents' engineer admits that the source of the water in Eight Mile slough is Eight Mile creek, and I am left with no doubt upon the evidence that the two constitute but one and the same natural water course. It is not material that no definitely defined channel appears on the surface. Visible banks are not necessary characteristics of a water course.

In New York, C. & St. L. R. Co. v. Hamlet Hay Co., 149 Ind. 344, 47 N. E. 1060, the court says:

"That the banks of the streams are not everywhere clearly and sharply defined is not controlling. The character of the country through which the stream flows must be taken into account. Where the country is hilly or rolling, the fall rapid, and the soil easily cut and washed, there will, in general, be a deep and well-marked channel. Where, however, the country is flat, the fall slight, and the soil turfy and full of roots and strong grass, there the channel will often be shallow and the sides in many places not sharply defined. But as said in Mitchell v. Blain, 142 Ind. 604, 42 N. E. 230 (citing authorities): 'A stream does not cease to be a water course and become mere surface water, because at a certain point it spreads out over low ground, several rods in width, and flows for a distance without a defined channel or banks before flowing again in a definite channel. If a water course is lost in a swamp or lake, it is still a water course, if it emerges therefrom in a well-defined channel.' "

See, also, Lambert v. Alcorn, 144 Ill. 313, 33 N. E. 53, 21 L. R. A. 611; Rigney v. Tacoma Lt. & Power Co., 9 Wash. 576, 38 Pac. 147, 148, 26 L. R. A. 425; Macomber v. Godfrey, 108 Mass. 219, 11 Am. Rep. 349; 2 Farnham, p. 1558.

In Strait v. Brown, 16 Nev. 317, 40 Am. Rep. 497, the waters of a spring left their natural channel and flowed underground for a distance of half a mile into a certain creek. The court protected an appropriation from the creek as against a diversion from the springs on the ground that even in the absence of a definite surface channel the continuity of the stream was established by reason of the fact that the springs were the definite source of supply.

Whether, therefore, we consider Eight Mile creek and Eight Mile slough a continuous stream in visible fact, or decide its continuity on the ground adopted in Strait v. Brown, it appears sufficiently clear that an appropriator from Eight Mile slough may restrain a diversion from Eight Mile creek.

[6] This brings us to the question of the extent of the rights of the parties in the waters in controversy. The amount of water to which the complainant is entitled from the several streams in question can, I think, best be determined under the evidence by the acreage severally irrigated by these streams. In fact, I find no other practical basis afforded by the evidence. The amount of water necessary for the irrigation of these lands is estimated by complainant's engineer at approximately two miners' inches an acre, and at three miners' inches by respondents' engineer. I am disposed upon all the evidence to adopt the former estimate as being amply sufficient. Complainant's engineer Coleman gives the acreage under irrigation on the complainant's ranch from Twelve Mile creek as 310.14 acres; and, this being not disputed, it would be entitled thus to 620.28 miners' inches of Twelve Mile water. From Eight Mile slough the acreage irrigated on the Hoppin ranch was 608.33 acres, and this area therefore required 1,216.66 inches of water. The Flynn appropriation for 6.77 acres would consume 13.54 inches. Irrigation on the complainant's ranch from Quin river was applied to 125.2 acres of meadow; and 114.6 acres of pasture, irrigated from Beef Corral slough; and 219.85 acres of pasture lying between and irrigated from both the river and the

slough. This total of 459.65 acres would need 919.3 inches of water. These figures will be adopted as the measure of complainant's rights.

It will be obvious that the above estimate of complainant's appropriation from Eight Mile slough includes water diverted from Quin river or Beef Corral slough by the Company ditch, the Plowbeam ditches and Tom ditch into Eight Mile slough above the Anderson ranch. There is not sufficient data in the evidence to segregate the amounts of the waters thus mingled; but a decree may be so drawn as to protect the complainant, if necessary, to the end that Quin river water may continue to swell the Eight Mile water sufficiently to satisfy the appropriation made from the latter channel.

The estate of Charles McConnell has clearly an appropriator's right to the waters of Eight Mile creek and Quin river in addition to what has been specified sufficient to irrigate a considerable acreage of meadow and pasture, but subordinate to complainant's rights. The evidence, however, does not afford any basis on which findings can be made as to the acreage of the McConnell lands irrigated by the streams severally. The total acreage irrigated by McConnell, other than the alfalfa lands, may be determined; but I cannot tell the several tracts lying under the flow of the different streams in controversy. No other satisfactory basis of determining their secondary right seems to be presented. In view of the fact, however, that the Charles McConnell estate may under this decision first use the waters of Quin river and Eight Mile creek to the fullest extent compatible with their obligation to deliver to complainant through the channels named, the amounts of water to which they are entitled as above stated, it does not appear that respondents can or will suffer any injury in this regard.

From what has been said it is obvious that Thomas McConnell individually has no right to any of the water in controversy except in subordination to the other parties herein.

Let a decree be entered in accordance with the findings accompanying this opinion, with costs to the complainant.