[No. 29639. Department Two. October 25, 1945.]

MIKE DESIMONE et al., Respondents, v. MUTUAL MATERIALS COMPANY, Appellant.[1]

Simmons & McCann, for appellant.

Nicholas A. Maffeo, for respondents.

[1] Reported in 162 P. (2d) 808.

JEFFERS, J.—This is the second time this cause has come before this court. The decision of this court on the first appeal will be found in 20 Wn. (2d) 434, 147 P. (2d) 945.

The action was originally commenced in August, 1942, by Mike Desimone and wife against Mutual Materials Company, to recover damages for the loss of a growing crop on what will be referred to as tract C, which tract was in the possession of and cultivated by plaintiffs, and also to recover damages to another tract of land of which plaintiffs were the owners in fee simple. Plaintiffs' claim for damages was based upon the tortious casting of sand and water upon the above property by defendant. Plaintiffs also asked that defendant be permanently enjoined from so discharging water upon plaintiffs' land as to cause them damage.

In the first trial of the cause the lower court, after hearing the evidence and viewing the premises, on June 19, 1943, made and entered its decree wherein the defendant was permanently enjoined from collecting or concentrating water or sand or both upon plaintiffs' property in such a manner as to cause any damage thereto. The decree further provided that plaintiffs were entitled to damages against defendant for destruction of the following named crops in the following amounts: Corn crop, one hundred dollars; tomato crop, two hundred twenty-five dollars; pea crop, one hundred thirty-five dollars; and bean crop, one hundred fifty dollars. Plaintiffs were also awarded the sum of three hundred thirty dollars as damages to the land owned by them in fee simple.

A motion for new trial was made and denied, and defendant appealed from the above judgment.

We quote from the decision of this court in 20 Wn. (2d) 434, *supra,* in order that it may be understood just what action was taken by this court on the former appeal:

"While there is ample evidence to sustain the decree of the trial court that the unsevered crops on the land owned by King county [tract C] and farmed by respondents were damaged by the appellant's wrongful discharge of waters and sand thereon and that the tract of land owned in fee

by respondents was also damaged by the tortious acts of appellant, the trial court's adoption of an erroneous measure of damages for the *loss* of growing crops makes necessary a new trial.

"We are committed to the rule that the proper measure of damages for the *loss* of a growing crop is the value of the crop at the time of the loss. This value may be ascertained either by evidence showing the reasonable value of the crop upon the land at the time of the loss, or the market. value at the time of maturity less the cost of seeding, harvesting, and marketing. . . .

"There was testimony of what the market value of the crop would have been had it matured, but there is no evidence of the cost of seeding, harvesting, and marketing.

"The judgment is reversed and the cause remanded, with direction to grant a new trial." (Italics ours.)

On the second hearing before the trial court, the same pleadings were used and considered in making up the issues as were before the trial court on the first hearing.

The cause came on for hearing the second time in October, 1944, before a different judge than the one who had presided at the first hearing. The court, after hearing the testimony of some twenty witnesses, and after viewing the premises, on January 15, 1945, made and entered its decree, which in substance is the same as the decree entered after the first hearing, the only difference being that in the decree from which this appeal is taken the court allowed damages to respondents for loss of their crops in the following amounts: Bean crop, $149.25; pea crop, $99.25; corn crop, $61.75; and tomato crop, three hundred dollars. Plaintiffs were also allowed four hundred dollars for damage to their freehold.

After motion for a new trial was denied, defendant timely appealed from the judgment entered January 15, 1945, and the cause is now before us on this second appeal.

Appellant assigns as error the refusal of the trial court to grant its challenge to the sufficiency of the evidence; failure to grant judgment in favor of appellant; allowance of recovery where no effort was made by respondents to mitigate or avoid the alleged damages; the measure of dam-

ages used; and the court's refusal to grant appellant a new trial.

No findings of fact were made by the trial court in either of the trials of this cause, presumably because it was considered an equity case, as injunctive relief was asked for.

The trial court did, however, make and file a memorandum decision, from which it appears that while practically the same witnesses testified in this hearing as testified at the former hearing, and while the record of the former hearing was before the court in this hearing, the record was sent back to the supreme court, and so the judge did not have a chance to compare the testimony of the witnesses at the former hearing with their testimony at the second hearing. The court therefore considered the second hearing as a new trial, and its decision was based on that theory. We shall therefore adopt the theory of the trial court, and will not consider that any factual situations presented here were decided by our former decision and hence became the law of the case. Of course, the proper measure of damages as set out in our former decision became the law of this case as to the measure of damages. We state frankly, however, at the outset that where, as in this case, two trial judges of long experience have heard the testimony of practically the same witnesses, have viewed the premises, and have arrived at practically the same conclusions as to the facts, this court will be most reluctant to reverse the case, unless some error or errors in law were committed which require a reversal.

May we again call attention of the bar to a situation presented by this record, and which to a greater or less degree is found in many records, where witnesses are attempting to testify to some physical fact upon a map or plat. In the instant case most of this voluminous statement of facts of some five hundred sixty-three pages consists of testimony in regard to certain physical facts supposed to appear upon respondents' exhibit 1, to which we shall later refer more in detail. We find page after page of testimony where witnesses, being interrogated in regard to such facts, would answer "here," "there," "up here," "down there," or words

of similar import; in other words, would fail absolutely to tie in their testimony with any place or object on the exhibit. We appreciate that the ordinary witness does not understand the importance of definitely locating the place or object about which he is testifying, unless counsel insist that he indicate by some mark or other identification the place or thing about which he is testifying. When such a record comes to this court, and we do not even have the advantage which the trial court enjoys of seeing the witnesses point to or otherwise indicate on the map what he is talking about, it becomes almost impossible for us to follow the testimony of the witnesses.

In order that we may have before us some picture of the relative positions of the land and other physical features with which we are here concerned, we shall attempt to locate them as they appear on respondents' exhibit 1, which was used by both sides in the examination of witnesses.

This exhibit was prepared by Martin Crause, a civil engineer, whose qualifications were admitted. It was prepared after a personal inspection of the premises. The trial court had this to say about Mr. Crause:

"Considerable expert testimony was offered on behalf of the plaintiffs. I was particularly impressed with the testimony of Mr. Crause, an engineer who has had experience in his line of work, and he made a topographic sketch of the area involved, which was used throughout the trial. He took various elevations on tracts B and C and testified that on tract C there was evidence of sand coming from tract B and that the sand spilled over the bulkhead; that the *land* reached the top of the bulkhead on tract B and overflowed on tract C."

Exhibit 1 shows the area bounded on the north by Cloverdale street, on the west by First avenue south and Myers Way, on the south by Trenton street, and on the east by Fifth avenue south. This area is just south of Seattle.

Tract B, which at all times herein mentioned was owned by appellant, lies just south of and borders on Cloverdale street. To the east of tract B is tract F. Immediately south of tract B is tract A, which extends south to Trenton

street, west to Myers Way, and east to tract C. Tract C also lies south of tract B, and is immediately east of tract A. This tract is bounded on the south by Trenton street, and extends east to a tract marked "Desimone." The Desimone tract is a piece of land one hundred feet wide east and west, and two hundred twenty-five feet long north and south. This is the tract owned by respondents in fee simple, and upon which their house is located. Tract C is approximately two hundred twenty-five feet wide, that is, from Trenton street to the south line of tract B. Tracts A and C were formerly owned by respondents, but, during the depression, respondents did not pay the taxes on these tracts, and they were acquired by the county at tax foreclosure sale. Since the first hearing, appellant has acquired title to tracts A, C, and F.

Starting in the southwest corner of tract A is what is described as "old ditch location." This ditch extends northeasterly across tract A, across the northwest corner of tract C, thence east between tracts B and C, and thence north into tract F, where it ends. This ditch was constructed many years ago, and apparently was sufficient to drain the area adjacent thereto so that at least parts of tract C could be cultivated and used for growing garden truck. In fact respondents testified they had farmed a part of tract C since 1924.

Appellant's sand bunkers with which we are here concerned are located just south of Henderson street on Myers Way. A flume is shown from these bunkers running north along Myers Way to the southwest corner of tract A, where it connects with another wood flume. This last flume extends northeast across tract A and onto tract B, where it ends. This last-mentioned wood flume was constructed by appellant in 1938 or 1939. Surrounding the outlet of this flume in tract B and extending south into tract C is what is described as a sand fill. In other words, as we understand the testimony, the excess sand and silt is carried from appellant's bunkers through their flume by the water and has spread out over this area. This sand fill extends over into tract C just to the west of the land upon which re-

spondents had the crop here involved. Between the sand fill in tract B and tract C is a shiplap bulkhead constructed by appellant in an attempt to keep the sand from being carried from tract B over to tract C. This was constructed before appellant became the owner of tract C.

Just to the west of First avenue south are Durham spring, Angelo spring, and Donavan spring. Apparently the waters which came from these springs onto what are now tracts A, C, and B formerly drained off to the northeast, or were sufficiently taken care of by the old ditch between tracts B and C, so that it has for years made possible the farming of parts of tract C, especially that part farmed by respondents. We are not sure whether or not appellant, in the operation of its bunkers, now uses any water from Angelo spring, but it does use the waters of Durham spring. The waters of Durham spring formerly followed the natural drainage to the northeast, and did not interfere with respondents' operations on tract C.

The method of operating these bunkers is described by Mr. McGill, secretary-treasurer of appellant, who has been familiar with this property for many years. He testified as follows:

"Q. How do you operate that bunker? A. By hydraulic method, sluicing the sand, saving the— Q. (Interrupting) Tell the court just what you do. Just tell him. You won't need to point out anything. Just tell him. A. The sand is brought from the pit to the top of the bunker, where the washing boxes are. The good sand is saved in the bunkers and waste goes over. Q. Do you also get some gravel with this sand? A. Yes, sir. Q. And is that separated by screens? A. Yes, sir. Q. Now what would be carried away with the water in the washing process? A. The silt and the overfines. Q. And where is that taken to? A. A flume carries it down to the swamp. Q. I will give you this pointer in case you want to point out to the court some point. A flume carries it down to the swamp. What would you call the swamp? A. This section on tract B where the discharge from the flume is made."

While there is conflict in the testimony there is ample evidence to show that the sand carried through appellant's flume and dumped on tract B has so raised the

level of tract B in the area described as "sand fill" that the water coming from the flume, instead of draining off to the northeast as it formerly did, drained back to the south; that, in so doing, it filled up tract B with sand behind the bulkhead between tracts B and C and also the ditch, and then both sand and water came over onto tract C.

It further appears by substantial evidence that water began to be noticed on tract C in the winter of 1941 and 1942, just west of the land upon which respondents had their crops.

Respondents began to plow for the planting of early peas in January, 1942, and, after plowing, seeded ten rows of peas, the rows being two hundred feet long. They subsequently plowed for and seeded beans, corn, and tomatoes. Water began to come onto respondents' land to such an extent that they could not cultivate their crops, and finally, sometime in May, the water was so bad they could do nothing with their land and gave up.

It further appears that when the water began to come on their land, respondents notified appellant and tried to get appellant to clear out the ditches, but nothing was done.

Respondents finally abandoned all attempts to farm this land in tract C sometime in May, 1942. It further appears that water stood on tract C until fall, and that water stood on tract C in the spring of 1943 until the time of the first hearing.

The effect of appellant's testimony was that the water condition on tract C was not caused by appellant's operations, but by unusual rains.

Two trial courts, as we have said, apparently accepted respondents' theory of the water condition.

■ Respondents' testimony showed the market value of the crops at maturity, and the testimony of Mr. Desimone and other credible witnesses showed the cost of seeding, harvesting, and marketing the crops. In other words, respondents attempted to comply specifically with the rule announced by this court in the former appeal, and we are not prepared to say that the trial court erred in entering

judgment for the loss of the respective crops in the amounts set forth in the judgment.

Nor are we disposed to say the trial court erred in allowing four hundred dollars damages to the freehold. We quote from the memorandum opinion of the trial court relative to the cause of respondents' damage:

"It is my considered opinion, in view of the character of the land and the fact that this land had been farmed for years, that if the bunkers constructed by defendant, which necessitated the construction of flumes and the appropriation of the waters of Durham creek and Angelo Spring creek in connection with their operation, had never been constructed, the flooding of plaintiff's land would never have taken place."

We therefore conclude that appellant's first and second assignments of error are not well taken.

■ It is next contended by appellant that the court erred in allowing any recovery to respondents because they made no attempt to mitigate or avoid the damages. While we do not think the above contention is strictly true, for the reason that as to the crops there is testimony to the effect that there was nothing respondents could do to save their crops, and as to the damage to the freehold there is testimony that they tried to keep the water away from their house but were unable to do so, but be that as it may, and admitting for the sake of this contention of appellant that respondents might have made more of an effort than they did to protect both their crops and their house, we announced in *Champa v. Washington Compressed Gas Co.*, 146 Wash. 190, 262 Pac. 228, that the requirement of minimizing damages does not apply to cases of nuisances or in cases of intentional or continuing torts. There is sufficient evidence in this record to show that the tortious acts of appellant continued from the early spring of 1942 until the first trial in the spring of 1943. This being true, it was not necessary for respondents, in order to recover in this action, to show that they had made a reasonable effort to minimize the damages.

■ It is next contended that the court erred in not off-

setting or allowing for the crops which matured. Here again there is a conflict in the testimony. Evidence was introduced by appellant to the effect that some of the crops did mature and had some commercial value, while the testimony of respondents tended to show that the crops were a complete loss.

Viewing the testimony as we do, we are unable to say the court erred in adopting a measure of damages applicable to a loss of a growing crop.

We are also of the opinion that there is substantial evidence to support the granting of injunctive relief as to respondents' freehold. See *Rigney v. Tacoma Light & Water Co.*, 9 Wash. 576, 38 Pac. 147, 26 L. R. A. 425; *Peters v. Lewis*, 28 Wash. 366, 68 Pac. 869; *Ehorn v. Northwest Magnesite Co.*, 131 Wash. 270, 230 Pac. 419.

We find no error in this record which would justify us in holding the trial court erred in refusing to grant appellant's motion for new trial; and being of the opinion there is substantial evidence to support the judgment, we conclude that the judgment should be, and it is, affirmed.

BEALS, C. J., BLAKE, ROBINSON, and GRADY, JJ., concur.