[No. 42920. En Banc. August 15, 1974.]

JOHN P. KING et al., *Respondents*, v. THE CITY OF SEATTLE,
*Appellant*.

*A. L. Newbould, Corporation Counsel,* and *Gordon F. Crandall, Assistant,* for appellant.

*Lee Olwell* (of *Olwell, Boyle & Hattrup*), for respondents.

UTTER, J.—The City of Seattle appeals from a ruling by the trial court awarding damages to John P. King and his wife. The damages were for the City's alleged intentional and wrongful refusal to issue street use and building permits to the Kings.

The City contends that its acts are immune from liability because they involve the erroneous exercise of discretion and, even if no immunity exists, that its acts were not the

proximate cause of the Kings' damages. We find no immunity under the facts of this case, but conclude there is no showing that the City's acts were the proximate cause of the Kings' damages.

The Kings were contract purchasers of lots submerged in Lake Union in Seattle. The lots abut Fairview Avenue East which is itself partially submerged along the edge of the lake where it adjoins the lot boundaries. The Kings first applied for a building permit in January 1969 to construct an apartment building on the lots. They were unable to obtain a lease from the State of Washington for adjoining state land which would have been necessary to meet the zoning requirements for construction of an apartment building. Their failure to obtain the leased land resulted in denial of the building permit.

In March of 1970 the Kings applied for a building permit to enable them to construct an office building on the same lots. This building did not require the use of additional land. A condition precedent to the granting of the building permit, however, was the issuance of a street use permit by the Board of Public Works, an agency of the City. The Board of Public Works denied the application for the street use permit at that time, based upon their judgment that a street use permit might conflict with a pending local improvement district plan, not yet enacted by ordinance. The building department denied the building permit at that time because no street use permit was granted.

The Kings then brought a mandamus action on May 15, 1970, to require the issuance of street use and building permits by the City. On June 11, 1970, a judgment was entered directing issuance of the building permit and street use permit either in the form requested or upon reasonable terms and without unreasonable delay. The court also found that the prior action of the City in refusing the same was arbitrary and capricious and without justification in law. The building permit was issued on June 16, 1970, and a street use permit authorizing construction of two ramps

from the existing improved street area to the Kings' property was issued on July 22, 1970.

On May 26, 1970, however, the United States Corps of Engineers had changed its regulations to require permits over water areas inside the harbor or pierhead lines. For 70 years prior to this the Corps had required permits only in navigable waters beyond the established harbor or pierhead lines. After the issuance of the street use permit pursuant to court order, the Kings did not make application to the Corps for an overwater building permit for their office building but, apparently, abandoned the project. They ceased making payments on the property in the summer of 1970 and in November 1970, quitclaimed their interest in the property to the vendor following service of a notice of forfeiture. No attempt was made to sell their interest in the property nor was it listed with a real estate broker.

The Kings, in this action, seek from the City damages and expenses for their loss of profit on the office building which they were unable to construct. The trial court found that "[f]ollowing the revision of the Army Corps regulations, it became impossible for Plaintiffs to construct the proposed office building . . ." (Finding of fact No. 8.), "the said actions of the Defendant City of Seattle were a proximate cause of the losses and damage sustained by Plaintiffs, and the nature of said damage was reasonably foreseeable" (Finding of fact No. 9.), and "the actions of the Defendant City of Seattle in refusing to issue a permit to Plaintiffs for an office building, from and after May 7, 1970, and in denying Plaintiffs any access to their own property involved no exercise of discretion, and in no manner were legislative or part of the planning process" (Finding of fact No. 10.).

The trial court awarded damages for costs and expenses of $54,524.36 and for lost profits on the proposed office building of $311,018.02.

The City appears to attempt to relitigate the characterization of the nature of its acts of April 22 in denying the street use permit and refusing to grant a building per-

mit as arbitrary and capricious and without justification in law. The City's failure to appeal the findings of fact, conclusions of law and judgment in that case collaterally estops them from litigating those issues and is binding on the parties as to those issues in this case. Parties are collaterally estopped by judgment where the facts and issues claimed to be conclusive on the parties in the second action have been actually and necessarily litigated and determined in a prior action. *Henderson v. Bardahl Int'l Corp.,* 72 Wn.2d 109, 431 P.2d 961 (1967). The doctrine of collateral estoppel differs from res judicata in that, instead of preventing a second assertion of the same claim or cause of action, collateral estoppel prevents a second litigation of issues between the same parties even in connection with a different claim or cause of action. *Bordeaux v. Ingersoll Rand Co.,* 71 Wn.2d 392, 429 P.2d 207 (1967); *Goetz v. Board of Trustees,* 203 Kan. 340, 454 P.2d 481 (1969).

 The City urges, however, that its acts were purely of a governmental, policy-implementing character and the abrogation of governmental immunity in Washington did not expose the City to tort liability when performing such functions. Laws of 1963, ch. 159, § 2 (RCW 4.92.090) provides: "The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation." This statute, by its terms, does not render the State liable for all official misconduct. As we said in *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 253, 407 P.2d 440 (1965), it is necessary to determine where, in the act of government processes, orthodox tort liability stops and the act of governing begins. "It is a gross understatement to say . . . that marking a definitive dividing line, with any degree of clarity or certainty, is fraught with some legal as well as factual difficulty."

Immunity of governmental officials for discretionary acts historically has been independent of that advanced to justify the immunity of the state from liability for torts for which

its agents are liable. The justification for this immunity, as stated by Judge Learned Hand in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949), is that "it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. . . . In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *See also Muskopf v. Corning Hosp. Dist.,* 55 Cal. 2d 211, 359 P.2d 457, 11 Cal. Rptr. 89 (1961).

These fears are not founded upon fact, however, if it is the municipality and not the employee who faces liability. The most promising way to correct the abuses, if a community has the political will to correct them, is to provide incentives to the highest officials by imposing liability on the governmental unit. The ranking officials, motivated by threats to their budget, would issue the order that would be necessary to check the abuses in order to avoid having to pay damages. K. Davis, *Administrative Law Treatise,* § 25.17 (Supp. 1970) at 864-65. The idea that public entities and not officers or employees should ultimately bear liability springs from *United States v. Gilman,* 347 U.S. 507, 98 L. Ed. 898, 74 S. Ct. 695 (1954).

As noted in K. Davis, *Administrative Law Treatise,* § 25.18 (Supp. 1970), at 870:

> A discretionary function exception is essential to a good system of law on governmental tort liability, but the exception should not be pushed beyond the reasons behind it. . . .
> . . . Fears that a system of liability for deliberate torts may cause unwanted results are satisfactorily answered by the experience in New York and California, where governmental units are often liable for deliberate torts of their agents.

As we recognized in *Evangelical Church,* at page 254, " 'Liability cannot be imposed when condemnation of the acts or omissions relied upon *necessarily* brings into question the propriety of governmental objectives or programs or the decision of one who, with the authority to do so, determined that the acts or omissions involved should occur or that the risk which eventuated should be encountered for the advancement of governmental objectives.' " We then set forth, at page 255, four preliminary questions to assist in ascertaining whether an act was a discretionary governmental process and therefore nontortious, regardless of its lack of wisdom. " (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?" This court concluded that "[i]f these preliminary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom. If, however, one or more of the questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved."

In further refining what process must be entered into by the court in determining whether an act is discretionary or not, the court in *Johnson v. State,* 69 Cal. 2d 782, 788, 790, 793, 794, 447 P.2d 352, 73 Cal. Rptr. 240 (1968), rejected as semantic inquiry into the meaning of "discretion-

ary" inasmuch as " '[I]t would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail.' " The court recognized that " 'Since obviously no mechanical separation of all activities in which public officials may engage as being either discretionary or ministerial is possible, the determination of the category into which a particular activity falls should be guided by the purpose of the discretionary immunity doctrine.' " It stressed that judicial abstension should be assured in areas in which the responsibility for *"basic policy decisions* has been committed to coordinate branches of government." The court directed those seeking to determine whether an act is discretionary or not to "find and isolate those areas of quasi-legislative policy-making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision."

■ Immunity for "discretionary" activities serves no purpose except to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government. Accordingly, to be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.

In *Weiss v. Fote*, 7 N.Y.2d 579, 586, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960), the Buffalo Board of Safety, exercising its discretion, chose a time interval between red and green in traffic lights which a trial jury found to be negligent. The appellate court reversed, reasoning that "absent some indication that due care was not exercised in the preparation of the design or that no reasonable official could have adopted it — and there is *no* indication of either here — we perceive no basis for preferring the jury verdict, as to the reasonableness of the 'clearance interval', to that of the

legally authorized body which made the determination in the first instance."

Whatever policy reasons may exist for discretionary immunity, we do not find them present in this case. The finding of fact that the City, through its Board of Public Works, acted arbitrarily and capriciously and without foundation in law and that it "intended to harass and discriminate against Plaintiffs and to prevent Plaintiffs from constructing a commercial building on their property"[1] brings it within the language in the *Johnson* and *Weiss* cases. Their holding that it is improper to extend the discretionary activity analysis to those cases where employees do not render a considered decision or render decisions that no reasonable official would have adopted applies here. The question whether the City's acts complained of here were of a kind usually nominated "ministerial" or "discretionary" is not material to our determination because earlier they had been determined conclusively to have been arbitrary and capricious.

Though not characterized by the parties, the tort complained of here is interference with prospective economic advantage. There are three elements to the tort. The plaintiff must prove that he had a relationship with others contemplating a contract, with at least a reasonable expectancy of fruition, that this relationship was known, or reasonably apparent, to the interferor, and that the interference which caused the termination of the relationship or expectancy was intentional. *Scymanski v. Dufault,* 80 Wn.2d 77, 491 P.2d 1050 (1971).

There is a reasonable basis from which to support the trial court's findings that the City intentionally acted to interfere with the plaintiffs' known or reasonably foreseeable business expectancy. The City was under a duty to act

---

[1]There is no direct evidence to support this finding. Rather, inferences must be drawn from the undisputed testimony regarding the City's failure to issue the permit. There is a rational basis for it, and, therefore, it must be sustained. *See Kinnear v. Graham,* 133 Wash. 132, 233 P. 304 (1925); *Lasser v. Grunbaum Bros. Furniture Co.,* 50 Wn.2d 191, 310 P.2d 259 (1957).

fairly and reasonably in its dealings with the plaintiffs. The findings of fact from the previous mandamus action, which the City is here collaterally estopped to deny, are to the effect that the City's acts were arbitrary and capricious and established the City's patent breach of duty. The City, however, argues in effect that it could not have foreseen the risk of harm which occurred. Specifically, it argues that the City could not and did not foresee the change in the Army Corps of Engineers' overwater building permit criteria which required, for the first time, a Corps permit for overwater building inside the pierhead line and that the City breached no duty to the plaintiffs and was, therefore, not liable for any resulting damage.

■ We have earlier held that foreseeability of the risk of harm to the plaintiff is an element of the duty question. If the risk of harm which befell the plaintiff as a result of the defendant's act was not reasonably foreseeable, our cases have held, then, as to that plaintiff, no duty respecting that act was owed. Thus, no duty was breached, and no legal liability attached to the defendant for that plaintiff's loss. *Rikstad v. Holmberg*, 76 Wn.2d 265, 456 P.2d 355 (1969); *Wells v. Vancouver*, 77 Wn.2d 800, 467 P.2d 292 (1970). A more complete discussion of the problem is found in *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928), dissenting opinion per Andrews, J.; Gregory, *Proximate Cause in Negligence — A Retreat from "Rationalization"*, 6 U. Chi. L. Rev. 36, 50 (1938); Prosser, *Proximate Cause in California*, 38 Cal. L. Rev. 369, 396 (1950).

Liability extends to foreseeable results from unforeseeable causes. It was foreseeable that arbitrary and capricious delay of the plaintiffs' building project could cause them damages, increase in the price of materials, the cost of labor, the interest rate on borrowed money, and many other specific areas of harm. Liability is not predicated upon the ability to foresee the exact manner in which the injury may be sustained. *Berglund v. Spokane County*, 4 Wn.2d 309, 103 P.2d 355 (1940).

In *Johnson v. Kosmos Portland Cement Co.*, 64 F.2d 193 (6th Cir. 1933), the defendant failed to remove the hydrocarbon residue from an oil barge, causing it to fill with highly volatile gas. Lightning struck the barge and exploded the gas, killing everyone on board. It was argued that the risk of lightning striking the barge and exploding the gas was not foreseeable and that, therefore, the defendant was not liable for the damages. The defendant was found liable, however. The court reasoned, "when the thing done produces immediate danger of injury, and is a substantial factor in bringing it about, it is not necessary that the author of it should have had in mind the particular means by which the potential force he has created might be vitalized into injury." *Johnson v. Kosmos Portland Cement Co., supra* at 196. In this case, the result of the City's action was foreseeable, and the City breached a duty owed to the plaintiffs to protect them from harm of that general nature.

The City's actions here were a cause in fact of the plaintiffs' damages, and the amount of damages is not disputed. But for the City's acts which delayed plaintiffs' ability to begin construction, the plaintiffs would have been able to build the structure over water before the changed Corps rule required a federal permit.

██ This is the sense in which the term "proximate cause" is often discussed. *See* WPI 15.01.[2] Cause in fact is not, however, the sole determinate of proximate cause, and in a broader sense the question of law as to whether legal liability should attach, given cause in fact, is the question still before us in this case. The plaintiffs here do not present a good cause of action against the City for interference with prospective economic advantage.

As a matter of policy we cannot say on these facts that

---

[2]WPI 15.01.

"Proximate Cause—Definition.

"The term 'proximate cause' means a cause which in a direct sequence, unbroken by any new independent cause, produces the [injury] [event] complained of and without which such [injury] [event] would not have happened.

"[There may be one or more proximate causes of an [injury] [event].]"

the defendant City should be legally liable for the plaintiffs' loss. Conceding all the other elements of tort liability are present, they are not sufficient in themselves to make out a prima facie case. The court still must adduce from the record whether, as a policy of law, legal liability should attach to the defendant if the other factual elements are proven and no affirmative defense is made out. "[C]ausation, as such, is a question of fact. Proximate causation is a question of law. The entire doctrine [of proximate cause] assumes that a defendant is not necessarily to be held responsible for all the consequences of his acts." McLaughlin, *Proximate Cause*, 39 Harv. L. Rev. 149, 155 (1925).

■ The trial court in finding of fact No. 9 determined that the City's acts were "a proximate cause" of the plaintiffs' damages. We treat this finding as a conclusion of law, its proper designation, subject to the review of this court as a question of law. *See* L. Green, *Rationale of Proximate Cause*, ch. 1, §§ 3-4 (1927); 1 T. Street, *Foundations of Legal Liability*, 110 (1906); Terry, *Proximate Consequences in the Law of Torts*, 28 Harv. L. Rev. 10, 24 (1914).

The standards which a court must apply to a tort action in determining whether legal liability should attach to the defendant if the factual elements of the tort are proven, are not susceptible of a conclusive and fixed set of rules, readily formulated. "[Legal liability] is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent. . . . The best use that can be made of the authorities on proximate cause is merely to furnish illustrations of situations which judicious men upon careful consideration have adjudged to be on one side of the line or the other." 1 T. Street, *Foundations of Legal Liability*, 110 (1906).

■ There are two reasons why we cannot say, as a policy of law, that the City should be subject to legal liability for the plaintiffs' damages in this case. The plaintiffs made no effort to exhaust their federal administrative remedies nor did they attempt to avoid their damages, even

though their real estate appraisers valued the property at $198,000 and the balance due on the real estate contract was approximately $106,000. The plaintiffs returned the property to the vendor rather than attempt to sell it.

The plaintiffs maintain that they elected not to apply for the federal permit and not to attempt a sale of their property because they no longer had the economic resources which in their judgment would have been necessary to adequately pursue these avenues. This was a voluntary business judgment.

Municipal liability for tortious interference with prospective economic advantage should not be premised on the independent unsubstantiated decision of a plaintiff that it would be unavailing to seek a possible administrative remedy accorded him under the law. If this were not so, the plaintiff would be able to create liability in another by his own independent judgment. We therefore find no legal liability (proximate cause) in the City for the plaintiffs' damages here.

The approach taken by the dissent begs the question. The question presented by this case is whether, given that the defendant City's acts were a cause in fact of the plaintiffs' harm, the City should be held legally liable for all of the plaintiffs' ultimate damages. The plaintiffs urge this liability should exist even though they had available to them but intentionally refused to exercise a known legal remedy which, if pursued, could have prevented all of their damages.

The doctrine of mitigation of damages which the dissent discusses is inapplicable to this case because the question of whether the plaintiffs had a duty to mitigate presupposes that the City is legally liable for the plaintiffs' damages in the first instance. We may not presuppose that issue here precisely because that is the issue presented for decision.

There was no finding of fact here that the plaintiffs, because of the City's bad faith tactics, could not have afforded financially either (1) to further pursue the federal

administrative remedy, seeking a Corps permit under the May 27, 1970, change in the regulations, or (2) to seek a determination in federal court that the Corps regulation change was not applicable to them. The record discloses that it was the plaintiffs' personal business judgment not to pursue the federal legal remedies available to them because, in their personal judgment, it would have been fruitless to do so. The record does not support plaintiffs' failure to pursue their remedies.

A neighboring developer, faced with the same legal question, received a judgment in the Federal District Court for the Western District of Washington which held that no application for a federal Corps of Engineers building permit was required under the May 27, 1970, change in the Corps requirements. The reasoning of the court was that the project had been "commenced," in the language of the new Corps rule, prior to the effective date of that Corps regulation change. "Commencement" was held to be mere preparation of plans for building, requiring no physical act such as driving piles, etc. *United States v. E.T. Hinrichs & Associates,* No. 9353 (W.D. Wash., Dec. 28, 1970). If plaintiffs here had not gratuitously quitclaimed their property back to their contract vendor on November 13, 1970, the reasoning of the *Hinrichs* case, entered 1 month later, would have required that the plaintiffs here be permitted to proceed without regard to the change in the Army Corps regulations.

We do not believe it would be wise judicial policy to allow one party to create legal liability in another by a voluntary exercise of the complaining party's own personal business judgment not to seek to protect his rights in the legal forums provided him. This is especially so where, if the complaining party had exercised his legal rights in the first place, there may well have been no damage to his interests at all.

We are mindful, nonetheless, of the potential for abuse which legal process may serve in the hands of public

officials, bankrolled with public funds, who seek to achieve by delay and the necessity for costly court suits or administrative hearings what they cannot achieve on the merits — the frustration of private citizens' legally protected activity. In another context, the facts set out in *Krahm v. Graham*, 461 F.2d 703 (9th Cir. 1972), present an example of the "chilling effect" on the free exercise of legal rights which the misuse of legal process may have and to which we here refer. In this case, however, there was no finding of fact that the plaintiffs had sacrificed their legal right to avail themselves of the existing federal administrative procedure because the City's prior wrongful acts had effectively sapped their financial ability to avail themselves of their legal remedy.

Reversed.

HALE, C.J., and FINLEY, ROSELLINI, STAFFORD, and WRIGHT, JJ., concur.

BRACHTENBACH, J. (dissenting)—I agree with all of the majority opinion except its conclusion that the defendant's actions were not a proximate cause of plaintiffs' damages. To be precise we should emphasize, as the majority correctly does, that we are not here speaking of proximate cause as cause in fact. The majority acknowledges that cause in fact did exist, linking the defendant's actions to the plaintiffs' damages.

Cause in fact does not lead automatically to legal responsibility. Again the majority is right in stating that there remains the question of whether the defendant should be legally responsible for the damages caused in fact. Proximate cause, in this sense, is an imprecise term. It really is a matter of policy of determining the extent of a defendant's liability for its wrongdoing. W. Prosser, *Torts* § 42, at 244 (4th ed. 1971).

Surely we must have some recognized legal theory upon which to base a conclusion that there is no legal responsibility here. What are the policy considerations which free

the defendant from responsibility for those damages which we acknowledge were in fact caused by defendant's actions? The majority advances two such reasons. First, that the plaintiffs did not seek the necessary permit from the Corps of Engineers and second, that they did not attempt to sell the property.

What the majority in fact and in reality is holding, in my view, is that, as a matter of policy, we will deny damages because these plaintiffs did not mitigate their damages. I find no other legal theory in the majority opinion to justify its conclusion.

There are several reasons why the principle of mitigation should not be the foundation for such a policy determination that no damages are recoverable. First, it is the wrongdoer to which we are affording this protection and we should proceed with caution in creating such freedom from liability. That is the philosophy of this court. *Hogland v. Klein*, 49 Wn.2d 216, 221, 298 P.2d 1099 (1956).

Second, the defendant was guilty of an intentional tort against plaintiffs. That is, interference with prospective economic advantage. The majority correctly characterizes the defendant's actions as an intentional tort. An intentional wrongdoer cannot place upon its victim the duty to mitigate. We have long so held. *Desimone v. Mutual Materials Co.*, 23 Wn.2d 876, 884, 162 P.2d 808 (1945); *Champa v. Washington Compressed Gas Co.*, 146 Wash. 190, 200, 262 P. 228 (1927). To apply mitigation principles in this case under the guise of a policy consideration in the context of determining proximate cause is unwarranted.

The majority rejects the plaintiffs' explanation that they could not—for economic reasons—pursue their federal administrative procedures for a permit or keep up the contract payments while trying to sell the property. The majority contends that the trial court made no finding that plaintiffs were without economic resources to continue their efforts. In fact, the trial court did enter a finding that the plaintiffs were forced to abandon the property. Implicit in that find-

ing must be the trial court's conclusion that plaintiffs were unable financially to pursue the project. The plaintiff wife testified that they did not have the money to proceed with the project and that they had no choice but to deed the property back to the contract vendor who had served notice of forfeiture. This is substantial evidence to support the trial court's finding that they were forced to abandon the premises.

I fail to understand why an intentional tort-feasor can or should escape liability because it happened to choose a plaintiff who did not have the financial resources to overcome the damages caused by the intentional tort.

In any event, contrary to the majority's rejection of this economic decision by plaintiffs, it is entirely fitting to evaluate plaintiffs' actions in light of their own financial condition. We have so held in *Hoff v. Lester,* 25 Wn.2d 86, 168 P.2d 409, 164 A.L.R. 751 (1946), and *Adams v. Thibault,* 49 Wn.2d 24, 297 P.2d 954, 57 A.L.R.2d 1372 (1956).

Returning to the two reasons assigned by the majority to its policy conclusion that no liability attaches, we find that these are tenuous grounds factually. The project could not go forward without a permit from the Corps of Engineers. The majority speculates that the plaintiffs could well have obtained such a permit. Yet the person in charge of issuance of such permits testified that in very similar circumstances it took almost 2 years to process such a permit. The defendant City chose to introduce no other evidence as to the likelihood of success or of the time which might be involved in securing the permit. Likewise, with regard to a possible sale of the property to recover the plaintiffs' equity, the City did not present any evidence as to the market demand for this property or the time it might take to find a buyer; indeed it proved nothing more than the gross equity. Recovery of the equity would not have offset the $311,018.22 which the trial court found to be plaintiffs' loss of profit on the contemplated building.

Under these circumstances I believe that justice requires

us to resolve any doubts as to proximate cause or mitigation in favor of the plaintiffs and against the intentional tort-feasor. I would affirm.

HUNTER and HAMILTON, JJ., concur with BRACHTENBACH, J.

Petition for rehearing denied December 17, 1974.