[No. 20014–3–I.   Division One.   December 19, 1988.]

BARBARA KARR, *as Personal Representative*, ET AL,
*Appellants*, v. THE STATE OF WASHINGTON,
*Respondent.*

*John A. Holmes* and *Graham & Dunn* (*Ronald G.
Franklin* and *Hill, Parker, Franklin, Cardwell & Jones*, of
counsel), for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Michael E. Tardif, Senior Assistant,* for respondent.

COLE, J.*—Barbara Karr and her fellow plaintiffs appeal the summary judgment entered against them in their wrongful death suit against Washington State. The plaintiffs are the personal representatives of 14 of the 60 persons killed in the May 18, 1980, eruption of Mount St. Helens. They brought this action against the State and the Weyerhaeuser Company seeking recovery for those deaths.[1] Plaintiffs allege that the State was negligent in establishing certain restricted zones around Mount St. Helens prior to the eruption. The trial court granted the State's motion for summary judgment and the plaintiffs have appealed.

Mount St. Helens and its immediate environs stand within the overlapping boundaries of the Gifford–Pinchot National Forest, the state of Washington and the counties of Cowlitz, Lewis, Clark and Skamania. Prior to May 1980, it was a popular recreational area and the location of a major Weyerhaeuser tree farm employing 800 to 1,000 loggers.

On March 20, 1980, earthquakes began to shake Mount St. Helens. The quakes increased in frequency and intensity for the next week. On March 25, 1980, the United States Forest Service (Forest Service) closed the mountain to all entry above the timberline. On March 26, 1980, the first of many meetings of local, state and federal agencies with jurisdiction over the volcano area was held in Vancouver, Washington. Representatives from affected power companies, private businesses and the media also attended.

One result of this meeting was the creation of the Emergency Coordinating Center (ECC) designed to operate out of the United States Forest Service office, coordinating

---

*Judge W.R. Cole is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150 and CAR 21(c).

[1]The Weyerhaeuser Company's dismissal is not at issue in this appeal.

services and planning related to volcanic activity. In addition, the various governmental entities agreed to restrict, coordinate and monitor air and ground traffic around the mountain. Administrative and enforcement responsibilities for these activities were assigned to specific agencies. The next day, March 27, 1980, the mountain issued its first significant eruption of steam and ash.

Another meeting followed on March 30, 1980, concerned primarily with the spiraling costs being incurred by the Counties in restricting and policing ground traffic. Curious citizens were flocking to the area despite warnings of potential dangers. The Counties declared states of emergency and requested that Governor Dixy Lee Ray do the same, thereby enabling the Counties to seek assistance from state agencies.

On April 2, 1980, the various agencies and the media received a press release titled "Past Effects of Mount St. Helens Volcano" from the United States Geological Survey (USGS).[2] The release did not predict the outcome of the volcanic activity but indicated that the present level was probably harmless to "the lives or health of people in areas more than 20 miles north, east, and south of the volcano, or more than 10 miles west of the volcano." On the same date, the Governor established a "Mount St. Helen's Watch Group" comprised of representatives from those state agencies most involved with the volcano. The Watch Group was charged with developing plans and recommending actions to be taken by state government in response to the volcano.

The Governor declared a state of emergency on April 3, 1980, and directed that the State Disaster Preparedness

---

[2]The USGS was the source of most technical scientific information concerning the volcano. It employed Dr. Dwight ("Rocky") Crandell and Dr. Donal R. Mullineaux who, in 1978, had studied Mount St. Helens and published a scientific bulletin on the volcano. The USGS and the University of Washington monitored the mountain closely from March 27 through May 17, 1980, sending daily seismograph readings and other data to concerned agencies.

Plan be implemented. On the same day, the USGS scientists reported increased concern due to harmonic tremors on the mountain.

On April 7, 1980, the Watch Group met to clarify responsibilities and coordinate activities—*e.g.,* Department of Game and Fisheries personnel were directed to assist Washington State Patrol and National Guard in manning roadblocks. As volcanic activity continued, the Counties requested that Spirit Lake and Swift Reservoir be closed to all recreational use. Roadblocks became more restrictive and specific fines and terms of imprisonment were established for violators. On April 8, a Mount St. Helens Contingency Plan was completed by the ECC and accepted by other federal, state and local agencies. It was a comprehensive document concerning the volcanic hazards, coordination of services and evacuation plans for the area immediately surrounding Mount St. Helens. Governor Ray met personally with Dr. Crandell to discuss the volcano on April 10, 1980.

On April 23, 1980, the Forest Service received a letter from Dr. Crandell of the USGS warning that a "bulging" condition on the upper north flank of the volcano indicated the "distinct possibility" that an explosion or earthquake in that area might cause an avalanche of Forsythe Glacier. The avalanche debris would fall into Spirit Lake, causing floods and mudflows in the North Fork Toutle River Valley. Following a public hearing on April 25, 1980, the Forest Service designated two hazard areas on the mountain—the "red zone" and the "blue zone"—and planned closures of these zones. The red zone permitted much less access (off limits to virtually all persons) than was permitted in the blue zone (day use to specific persons or groups who could be quickly evacuated). On April 29, 1980, the Forest Service wrote to Governor Ray explaining that the Forest Service could not legally close state and private lands located within the red and blue zones, or State Highway 504, the primary access route to the mountain from the west. The Forest Service requested that the Governor "superimpose a

closure on what is known as the 'red area' and that portion of state highway 504 downstream on the Toutle River to a point that would allow control and a moderate amount of safety to the public."

A packet of materials was presented to the Governor for her review, explaining the need for closures and recommending the Forest Service request be granted. On April 30, 1980, both the state and federal closure orders were finalized. Each order closed the same "red" zone to everyone except specific government officials or search and rescue personnel. Each allowed varying degrees of access to the same "blue" zone with proper permits. The State order also provided for partial closure of Highway 504.

Also released on April 30, 1980, was additional scientific information from Dr. Crandell of USGS expressing enhanced concern about the bulge on the north flank of the volcano. The bulge was estimated to have moved outward 320 feet since August of 1979 and 20 feet between April 24 and April 29, 1980. The import of the USGS information was that an avalanche causing massive mudflows and flooding was a "distinct possibility." Also submitted to the USGS at that time was a study by Barry Voight, a University of Pennsylvania geologist, which labeled as a "legitimate possibility" an explosive blast from the bulge area capable of devastating an area as large as 27 square miles. However, the Voight study also noted that the volcano might need monitoring for as long as 20 years, suggesting that an imminent catastrophic event was not a certainty. Again, the information provided discussed a number of possible volcanic events but failed to predict the timing or the magnitude of any particular hazard. It was clearly stated in the USGS material that an avalanche represented the most serious potential hazard posed by the volcano.

Simultaneously, the press and the public were clamoring for increased access to the volcano as the summer season approached. On May 7, 1980, and May 9, 1980, concerned agencies met to address these issues and others related to the volcano. On May 13, 1980, the State Department of

Emergency Services (DES) issued a status report on a list of specific requests for help from local governments. DES also proceeded to coordinate and plan for a major eruption and related evacuation efforts. Input from all concerned jurisdictions was collected regarding modification of restricted zones.

On Saturday, May 17, 1980, DES submitted to Governor Ray proposed revisions of her April 30, 1980, closure of the red and blue zones. The amendments proposed a substantial expansion of the blue zone due to the "bulge" on the north slope,[3] and revision of the permit system to allow *greater* access to both red and blue zones. Before the proposed revisions could be acted upon by the Governor, and without any warning, the volcano exploded on Sunday, May 18, 1980. The plaintiffs' decedents were killed within minutes.

Although the volcano, in many respects, acted as scientists speculated it might,[4] no one predicted the complete lack of warning of the eruption or the unprecedented magnitude of the lateral blast. The blast spread ash and debris northward at estimated speeds of 220 to 250 m.p.h. and estimated temperatures of 680 degrees Fahrenheit. The blast lasted only a few minutes, although the eruption continued for 9 hours. The blast area spanned an area north of the crater in an arc of nearly 180 degrees. The arc measured 23 miles across (from east to west) and extended northwest for about 18 miles. The blast devastated an area 10 to 15 times larger than the largest known previous blast of Mount St. Helens, and approximately 15 times larger than Barry Voight's worst prediction.

---

[3]The reason for the proposed expansion of the blue zone was to include the north fork of the Toutle River. It was predicted that any flooding resulting from an avalanche would heavily involve this river valley.

[4]An earthquake did in fact cause a major landslide at the "bulge." Forsythe Glacier slid into Spirit Lake with resulting flooding and mudflows on the north fork of the Toutle River. The lateral blast suggested by Barry Voight also occurred, 20 to 30 seconds after the earthquake.

Sixty persons were dead or missing following the volcanic eruption. Most of them, including the plaintiffs' decedents, were outside the restricted zones established by the Forest Service and the Governor. In May of 1981 this suit was brought alleging that the Governor was negligent in her enactment of those restricted zones. Following extensive discovery, the trial court granted the State's motion for summary judgment finding that the State was immune from tort liability. Plaintiffs have appealed that order.

When a party's claims are dismissed on summary judgment, the appellate court engages in the same inquiry as the trial court. *Hontz v. State,* 105 Wn.2d 302, 311, 714 P.2d 1176 (1986). All evidence and reasonable inferences therefrom have been reviewed in a light most favorable to the plaintiffs below. *Johnson v. Schafer,* 110 Wn.2d 546, 548, 756 P.2d 134 (1988); *Morris v. McNicol,* 83 Wn.2d 491, 494, 519 P.2d 7 (1974). Having conducted this review, we hold that reasonable persons could reach but one conclusion: that the Governor made a considered policy decision in closing certain areas around Mount St. Helens. Consequently, the State was immune from tort liability and is entitled to judgment as a matter of law. *Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 511, 598 P.2d 1358 (1979).

In *Cougar Business Owners Ass'n v. State,* 97 Wn.2d 466, 647 P.2d 481, *cert. denied,* 459 U.S. 971, 74 L. Ed. 2d 283, 103 S. Ct. 301 (1982), the Supreme Court held that the Governor's action in declaring an emergency and restricting access to Mount St. Helens was a policy decision to which discretionary immunity applied:

> These allegations were brought pursuant to RCW 4.92-.090, which provides that the State is liable for tortious conduct to the same extent as private individuals. In interpreting that statute we held that truly discretionary governmental acts on an executive level could not be characterized as tortious and thus could not be cognizable under the statute. *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 253–55, 407 P.2d 440

(1965). We set forth a 4–part test for determining whether an action is truly discretionary:

> (1) Does the challenged act . . . necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act . . . essential to the realization or accomplishment of that policy, program, or objective . . .? (3) Does the act . . . require the exercise of basic policy evaluation, judgment, and expertise . . .? (4) Does the governmental agency involved possess the requisite constitutional, [or] statutory . . . authority . . . to do or make the challenged act . . .?

*Id.,* at 255. If all four questions can be clearly and unequivocally answered in the affirmative, then the act or decision can be classified as a discretionary governmental function and nontortious.

We subsequently reaffirmed *Evangelical* and refined the process of determining discretionary decisions by requiring that the State make a showing that a "policy decision, consciously balancing risks and advantages, took place." *King v. Seattle,* 84 Wn.2d 239, 246, 525 P.2d 228 (1974).

Criteria for characterizing an action as discretionary are met in the instant case. First, in an area affected by a natural disaster the preservation and maintenance of life, health, property and the public peace is a basic governmental policy. Second, in the case of a volcano, such as Mount St. Helens, the establishment of a restricted zone of entry around the mountain during a period of uncertain eruptions is essential to the realization and accomplishment of that policy. *Third, the decision of whether a particular area or town should be included within the restricted access zone requires the exercise of basic policy evaluation, judgment and expertise.* Fourth, the Governor possesses the requisite constitutional and statutory authority to restrict access to certain localities for the protection of the public. Finally, the Governor made a conscious decision to include the Town of Cougar within the area of the red zone because of her concern that it was exposed to danger from Mount St. Helens.

The only requisite factor appellants challenge as missing is the fourth factor in the *Evangelical* test. That is, appellants contend that the Governor lacked the constitutional and statutory authority to act as she did. We disagree.

(Italics ours.) *Cougar,* 97 Wn.2d at 471–72.

Plaintiffs contend that this case differs from *Cougar* because there the plaintiffs challenged the fourth prong of the *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 407 P.2d 440 (1965) test while here the third prong is at issue. That is, plaintiffs contend that the subject matter of the Governor's decisions was such that the State would have been immune had she in fact "exercised basic policy evaluation, judgment and expertise." However, they argue, she did not do so but acted without giving the matters at issue due consideration.

A discretionary decision, otherwise immune, can result in liability where, in fact, the decision was not made pursuant to a process consciously balancing risks and advantages. As stated in *King v. Seattle,* 84 Wn.2d 239, 246, 525 P.2d 228 (1974):

> Immunity for "discretionary" activities serves no purpose except to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government. Accordingly, to be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.

*Accord, Chambers–Castanes v. King Cy.,* 100 Wn.2d 275, 282, 669 P.2d 451, 39 A.L.R.4th 671 (1983); *Petersen v. State,* 100 Wn.2d 421, 434, 671 P.2d 230 (1983); *Miotke v. Spokane,* 101 Wn.2d 307, 336, 678 P.2d 803 (1984).

However, the plaintiffs' contention that the Governor made no considered policy decision in enacting the closures is simply not supported by the evidence. Neither Dr. Crandell, Dr. Mullineaux, Barry Voight, nor any other source of the scientific information concerning the volcano was able to accurately predict its eruption. The record demonstrates that the Governor was aware of the staggering array of possible hazards, and of the lack of scientific certainty as to which events were most likely or the timing or magnitude of those events. Based upon this information

and while under considerable public pressure to keep the area open for recreational and vocational purposes, the Governor closed the red and blue zones.[5]

The Governor made a "discretionary" decision. *Cougar Business Owners Ass'n v. State, supra.* Because it was a considered policy decision, balancing risks and advantages, this court cannot and will not substitute its judgment at this late date. *King,* 84 Wn.2d at 246.

Plaintiffs further contend that even if the Governor's decision was a considered policy judgment, her conduct is not immune from liability if "no reasonable official would have adopted such a judgment", citing *King v. Seattle, supra,* and *Stewart v. State,* 92 Wn.2d 285, 597 P.2d 101 (1979).

Plaintiffs are misreading those cases. In *King,* the City's challenged decision was made in an arbitrary and capricious manner, with an intent to harass and intimidate the plaintiff. The court held that, in such a case, whether the City's acts were "discretionary" is immaterial because immunity simply will not be granted as to such blatant governmental misconduct. *King,* 84 Wn.2d at 247.

In the instant case, the facts do not support a finding of arbitrary and capricious conduct by the Governor. Thus, the inquiry as to whether the challenged decision was "discretionary" in nature is appropriate. Having found the closures of the red and blue zones to be a discretionary decision, and having found that a considered exercise of that discretion was actually undertaken, our inquiry is at a close. There was no genuine issue of material fact remaining to be decided below and the State was entitled to judg-

---

[5]The zones were designated by the Forest Service based, in part, upon information from USGS scientists. The Forest Service specifically asked the Governor to "superimpose" a closure of the same area as to all state and private lands and roads and to establish a roadblock on Highway 504. This she promptly did after considering the available information.

ment as a matter of law. The trial court's order of summary judgment is hereby affirmed.

SWANSON and WILLIAMS, JJ., concur.

Review denied at 112 Wn.2d 1011 (1989).